# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

MARC E. BERCOON, WILLIAM A. GOLDSTEIN, and PETER P. VEUGELER,

              Defendants.

CRIMINAL CASE NO.

1:15-CR-022-LMM-JFK

## FINAL ORDER AND REPORT AND RECOMMENDATION

Remaining pending before the court are Defendant Goldstein's motion [Doc. 55], filed also on behalf of Defendant Bercoon, to suppress evidence obtained in the Securities and Exchange Commission's ("SEC") civil investigation and for disclosure of communications between the Department of Justice ("DOJ") and the SEC. Also pending before the court is Defendant Bercoon's motion [Doc. 147] and Defendant Goldstein's motion [Doc. 47] to suppress physical evidence turned over to the Government by a cooperating witness. All evidentiary hearings and briefing on the motions are completed, and the court enters the following order and report and

AO 72A
(Rev.8/82)

recommendation certifying that all matters pending before the Magistrate Judge have been ruled on and are submitted to the District Judge for final resolution.

### Disclosure of Communications Between DOJ and SEC

The court first will address why Defendants Bercoon and Goldstein have failed to establish the grounds necessary for this court to order the Government to produce all communications between the DOJ and the SEC in connection with the civil SEC enforcement proceedings and the criminal investigation of Defendants and MedCareers Group, Inc. ("MCGI"), a business entity associated with Defendants.  Defendants contend that they need this information in order to determine whether Defendant Goldstein's June 30, 2010, statement to the SEC and the responses to the SEC's August 17, 2010, subpoenas to MCGI and another entity associated with Defendants, Generation Zero Group ("GNZR"), are subject to suppression for violation of their Due Process rights.  [Doc. 55].  The court will then address Defendant Goldstein's motion to suppress his June 30, 2010, statement to the SEC on the grounds that the statement, although not custodial, was involuntary and is inadmissible at trial.

### I.    Background

In support of their request for the communications between DOJ, specifically the United States Attorney's Office for the Northern District of Georgia, and the SEC,

2

Defendants rely in large part on the same interactions between these entities and alleged sharing of information outlined in the motions to suppress wiretap evidence. [Docs. 51, 75, 77 and 118]. The court thoroughly addressed the shortcomings in those arguments and will not repeat that discussion herein. [Doc. 182 at 70-81]. In support of this motion for disclosure, Defendants specifically cite to the June 26, 2011, wiretap affidavit that according to Defendants evidences one investigation, not two separate investigations, conducted by the DOJ and the SEC. Defendants make this assertion based on the affiant's representations therein that the SEC is investigating MCGI as is the DOJ, that the SEC is aware of the criminal investigation and has participated in joint interviews with the DOJ, and that the SEC has provided historical information useful in the criminal investigation. [Doc. 90 at 5-6]. Defendants conclude "that (1) the SEC and criminal investigations were ongoing and simultaneous; (2) the SEC had been sharing information it had gathered which was 'useful to this criminal investigation'; and (3) the SEC had jointly interviewed with the FBI cooperating witnesses" are the grounds for requiring the disclosure of communications between the DOJ and the SEC. [Id. at 6]. Defendants further cite to the same wiretap affidavit noting "that the FBI 'began investigating' a purported market manipulation scheme in *August 2010* after meeting with a cooperating source and two cooperating witnesses.'

3

. . . [T]he SEC participated in the interview of the cooperating witnesses in this criminal investigation." [Id. at 8 (emphasis added)].[1]   And offering only rank speculation, Defendants contend that the SEC subpoena to GNZR in August 2010 must have been issued due to the criminal investigation.  [Id. at 9].

Although, as will be discussed, Defendants' proffer does not satisfy the necessary showing to obtain the communications being sought, due to Defendants' contention that they had not received details of any statements made to the SEC or of the subpoenas issued to MCGI and GNZR, including any responses thereto, the court ordered the Government to produce for the court's *en camera* inspection the information being sought by Defendants.[2]  The court relies in part on that inspection to fill in the blanks left by Defendants' motion.

The SEC began the civil enforcement investigation of MCGI on March 25, 2010, and the formal order authorizing the investigation of that and related entities was dated

---

[1]Defendants also discuss events in 2011, which due to the timing, the Summer and Fall of 2010, of the SEC seeking and obtaining information from Defendants and/or the corporate entities, is not pertinent to the court's evaluation [Id. at 8-9] and refer to SEC investigations in other cities, which as this court addressed in the initial report and recommendation [Doc. 182 at 70-81], are not pertinent to the Atlanta criminal investigation [Doc. 90 at 9-10].

[2]Those materials will be **SEALED** and available for the District Judge to review in conjunction with this order and report and recommendation.

4

July 16, 2010.  As noted in the sworn wiretap applications, the criminal investigation commenced in August 2010, and the Government advises that the Grand Jury investigation was initiated on August 31, 2010.  The first documented interaction between SEC staff attorneys and Assistant U.S. Attorneys ("AUSA") is mid-August 2010 referencing the first of the aforementioned interviews with cooperating witnesses. All of the interviews occurring in the Fall of 2010 were of individuals providing information in the SEC civil enforcement proceeding and were arranged by the SEC staff attorneys with the AUSAs invited to attend.

As will be discussed in greater detail in the next section, on June 30, 2010, one of the SEC staff attorneys, Natalie Brunson, had a twenty minute telephone conversation with Defendant Goldstein concerning his relationship with MCGI and individuals associated with that entity.  Following the conversation, Brunson mailed Defendant a letter thanking him for speaking with her and providing to him a SEC form 1662 which advised Defendant about his rights related to SEC investigations and the potential uses of information provided to the SEC.[3]  None of the materials provided to

_____

[3]A copy of this form is an exhibit at the evidentiary hearing on Defendant Goldstein's motion to suppress his statement.  [Doc. 159, Gov't Exh. 1 ("Supplemental Information Form")].

the court *en camera* reference any discussions between the SEC staff and DOJ attorneys either before or for at least a month after the interview with Defendant Goldstein.

On August 17, 2010, Brunson issued two SEC subpoenas, one to MCGI, in care of David M. Loev, Esq., The Loev Law Firm, PC, and one to GNZR, in care of David M. Loev, Esq., The Loev Law Firm, PC, seeking specified documents concerning the two companies. Accompanying each subpoena was a copy of the aforementioned SEC form 1662 which provides in pertinent part that individuals being investigated by the SEC are entitled to be represented by counsel at all times and to consult with that attorney. [Supplemental Information Form ¶ B. 2]. The form further advises in pertinent part as follows:

> 2. *Counsel.* . . . You may be represented by counsel who also represents other persons involved in the Commission's investigation. This multiple representation, however, presents a potential conflict of interest if one client's interests are or may be adverse to another's. [If this is the case,] the Commission will assume that you and counsel have discussed and resolved all issues concerning possible conflicts of interest. The choice of counsel, and responsibility for that choice, is yours.
> . . . .
>
> 5. *Fifth Amendment and Voluntary Testimony.* Information you give may be used against you in any federal, state, local or foreign administrative, civil or criminal proceeding brought by the Commission or any other agency.

6

> You may refuse, in accordance with the rights guaranteed to you by the Fifth Amendment to the Constitution of the United States, to give any information that may tend to incriminate you or subject you to fine, penalty or forfeiture.

[Id. ¶¶ B. 2 & 5].  And under the headings, Authority for Solicitation of Information and Effect of Not Supplying Information, the form provides in pertinent part as follows:

> *Persons Directed to Supply Information Pursuant to Subpoena*. . . . Disclosure of the information to the Commission is mandatory, subject to the valid assertion of any legal right or privilege you might have.
> . . . .
>
> If you fail to comply with the subpoena, the Commission may seek a court order requiring you to do so.

[Id. ¶¶ E, F].

And, finally, under the heading Principal Uses of Information, the form advises that, although the principal purpose of acquiring information is for the SEC's use, "[f]acts developed may, however, constitute violations of other laws or rules" and that "[i]nformation provided may be used in Commission and other agency enforcement proceedings." [Id. ¶ G].  And, under the heading Routine Uses of Information, the form states, "The Commission often makes its files available to other governmental agencies, particularly the United States Attorneys and state prosecutors.  There is a likelihood that information supplied by you will be made available to such agencies where

7

appropriate." [Id. ¶ H].  A long list of the other routine uses of information provided to the SEC is then provided.  [Id.].  Another attorney, Gregory Bartko, produced responsive documents to the SEC on September 16, 2010, September 27, 2010, and October 18, 2010.  None of the written communications between the SEC staff and the AUSAs from August 2010 through the end of October reference the issuance of the subpoenas to MCGI or GNZR.

There is no information that either Defendant Bercoon or Defendant Goldstein provided any further statements to the SEC or that any additional subpoenas were issued by the SEC to an entity controlled by either Defendant resulting in the production of any documents or other materials.[4]

## II.    Discussion

The court, after consideration of the arguments presented by Defendants and of the *en camera* production by the Government, advised the parties that the court was

_____

[4]In the fall of 2010, Brunson did have a unsolicited telephone conversation with Defendant Veugeler which took place when Defendant called Brunson after Brunson had made contact with some of his associates.  Defendants were provided with a summary report of this conversation which, according to Brunson, consisted primarily of Defendant Veugeler, who was upset, yelling at Brunson for contacting his associates and for allegedly causing his daughter to be harassed at school and advising Brunson that he was coming to Atlanta to see her which Brunson considered threatening. Brunson contacted the FBI and related information about the call when it occurred.

AO 72A
(Rev.8/82)

denying Defendants' request for disclosure of communications between the SEC and the DOJ.  However, the court did grant Defendants' request for discovery to the extent the Government had not produced information concerning Defendant Goldstein's June 30, 2010, conversation with Brunson, had not produced the August 17, 2010, cover letters, subpoenas and attachments to Mr. Loev for MCGI and GNZR and/or had not produced the responses to those subpoenas.  The Government was also directed to ensure that any and all statements by Defendants in the SEC civil enforcement proceeding had been produced.  The Government advises that the production of that information was completed by the Government's January 5, 2016, supplemental *en camera* production.  The following legal authority governs the court's decision.

Defendants have not alleged sufficient facts to place in issue the legitimacy of the SEC civil investigation or that disclosure of information obtained during that investigation to the DOJ violated their due process rights.  Accordingly, they are not entitled to the disclosure of communications between the agencies.  As recently summarized by the Fifth Circuit Court of Appeals:

> "There is no general federal constitutional, statutory, or common law rule barring the simultaneous prosecution of separate civil and criminal actions by different federal agencies against the same defendant involving the same transactions.  Parallel civil and criminal proceedings instituted by different federal agencies are not uncommon occurrences because of the

9

> overlapping nature of federal civil and penal laws. The simultaneous prosecution of civil and criminal actions is generally unobjectionable because the federal government is entitled to vindicate the different interests promoted by different regulatory provisions even though it attempts to vindicate several interests simultaneously in different forums."

United States v. Simcho, 326 Fed. Appx. 791, 792 (5th Cir. 2009) (quoting F.D.I.C. v. Maxxam, Inc., 523 F.3d 566, 592 (5th Cir. 2008)). In fact, with respect to the investigation and prosecution of potential violations of SEC regulations and laws, parallel civil and criminal investigations and prosecutions are not only common, but the sharing of information between agencies is authorized by statute. See United States v. Moses, 219 Fed. Appx. 847, 849 (11th Cir. 2007) ("It is well established that the federal government may pursue civil and criminal actions either 'simultaneously or successively,' . . . and a federal statute expressly allows the SEC and the Department of Justice to share information relating to parallel investigations[.]") (citing 18 U.S.C. § 78u(d)); United States v. Stringer, III, 535 F.3d 929, 933 (9th Cir. 2008) ("Federal securities laws authorize the SEC to transmit evidence it has gathered to the USAO to facilitate a criminal investigation by the USAO.") (citing 15 U.S.C. §§ 77t(b) and 78u(d)); SEC v. Horowitz & Ullman, P.C., 1982 WL 1576, at *6 (N.D. Ga. March 4, 1982) ("the court notes that there is express statutory and regulatory authority for and a history of cooperation between the SEC and the Justice Department").

10

And the United States Supreme Court has recognized and approved the use of parallel civil and criminal investigations and prosecutions as necessary to protect the public interest.  See United States v. Kordel, 90 S. Ct. 763, 769 (1970).  In Kordel, the Supreme Court held that, on the record before the court, the defendants did not establish "either a violation of due process or a departure from  proper standards in the administration of justice" by the use of testimony taken in a civil proceeding against the defendant in the subsequent criminal prosecution.  Id.  The circumstances noted by the Supreme Court in Kordel which may establish a due process violation but were not present in that case - and, for that matter, are not present in the case under consideration, included: "the Government has brought a civil action solely to obtain evidence for its criminal prosecution or has failed to advise the defendant in its civil proceeding that it contemplates his criminal prosecution; nor with a case where the defendant is without counsel or reasonably fears prejudice from adverse pretrial publicity or other unfair injury; nor with any other special circumstances that might suggest the unconstitutionality or even the impropriety of this criminal prosecution." Id. at 769-70.

While these factors provide some guidance for courts considering the issue of whether a defendant's due process rights have been violated, this court agrees with the

AO 72A
(Rev.8/82)

District Court in <u>United States v. Scrushy</u>, 366 F. Supp. 2d 1134 (N.D. Ala. 2005), that the "determining principle" for deciding whether a defendant's deposition testimony should be suppressed on due process grounds is: "'the prosecution may use evidence acquired in a civil action in a subsequent criminal proceeding unless the defendant demonstrates that such use would violate his constitutional rights or depart from the proper administration of criminal justice.'" <u>Id.</u> at 1138 (quoting <u>United States v. Teyibo</u>, 877 F. Supp. 846, 855 (S.D. N.Y. 1995)) (emphasis deleted). And the court finds that the critical evidence that Defendants Bercoon and Goldstein must allege in order to make the necessary showing of a due process violation, that is, a departure from the proper administration of justice, is either that "the government made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case." <u>Stringer</u>, 535 F.3d at 937 (noting that courts have "occasionally" either suppressed evidence or dismissed indictments when one of these two factors is present).[5] Defendants have not alleged evidence raising such an inference – nor for that matter – any other evidence of bad faith by the Government. <u>See</u> <u>id.</u> at

_____

[5]The court has not found any decision suppressing evidence obtained in a civil investigation or proceeding or dismissing an indictment absent evidence of *either* improper motive in bringing or conducting the civil investigation or proceeding *or* affirmative misrepresentation during the course of the civil investigation or proceeding.

AO 72A
(Rev.8/82)

936-37 ("The Supreme Court has held that the government may conduct parallel civil and criminal investigations without violating the due process clause, so long as it does not act in bad faith.") (citation omitted).

Defendants contend that their proof establishes simultaneous investigations in which the SEC staff attorneys and AUSAs jointly interviewed some cooperating witnesses and the SEC shared information and documents with the AUSAs conducting the criminal investigation.  [Doc. 90 at 5-9].  In United States v. Melvin, 2015 WL 7116737 (N.D. Ga. May 27, 2015), adopted by 143 F. Supp. 2d 1354 (N.D. Ga. 2015), the defendant pointed to the facts that only thirteen pages of 200,000 pages of discovery were the product of the criminal investigation, the remaining being obtained from the SEC civil investigation, including materials produced by him, and contended that absent the SEC materials, there was an insufficient case to bring criminal charges.  Id., at *16.  However, the court held that these assertions, as is true of Defendants Bercoon's and Goldstein's in this case, offered as a basis for finding of misconduct "misunderstands the type of interaction required for the court to find a due process violation." Id. (citation and internal quotation marks omitted).[6]  The fact the defendant

---

[6]In Melvin, the court, noting that the defendant offered nothing other than speculation, found that the defendant failed to allege any facts entitling him to a hearing on his due process claim.  Id., at **16, 18.

13

in Melvin alleged, as Defendants Bercoon and Goldstein allege herein, that there were parallel investigations with the sharing of information simply does not support a finding of either that "the government made affirmative misrepresentations or conducted a civil investigation solely for purposes of advancing a criminal case." Stringer, 535 F.3d at 937.

The court in Melvin further noted that the "civil investigation was unquestionably initiated first, and the 'mere fact that included in the discovery materials were documents originating with the SEC does not support a conclusion that the SEC was part of a joint criminal investigation, that joint meetings were held, or that resources of the SEC were utilized in the criminal investigation under the direction and supervision of the federal prosecutors." Melvin, 2015 WL 7116737, at *16 (citation and internal quotation marks omitted). Likewise, in this case, the SEC civil enforcement investigation began in March 2010, and even the formal designation of the case in July 2010, preceded the opening of the criminal investigation sometime in August 2010. "The timing here matters, as the civil investigation came first, it is harder to show that the government initiated the civil investigation to obtain evidence to use

14

in pursuing criminal charges." <u>United States v. Kowalewski</u>, 2014 WL 6667127, at *20 (N.D. Ga. November 24, 2014).[7]

Because Defendants have not raised even an inference of improper conduct by the Government in this case instead only demonstrating at best that the SEC and the DOJ conducted parallel civil and criminal investigations and that the agencies cooperated with each other and that information was shared, they are not entitled to disclosure of communications between the SEC and the DOJ.  <u>See</u> <u>Kowalewski</u>, 2014 WL 6667127, at *21 (citing <u>United States v. Gangar</u>, 2007 WL 3552336, at *2 (W.D. Va. November 15, 2007) (denying the defendants an evidentiary hearing because they had "failed to make a threshold evidentiary showing giving rise to a reasonable concern about intertwinement . . . between the civil and criminal investigations") (citation and internal quotation marks omitted)).

---

[7]In <u>Kowalewski</u>, the court denied the defendant's request for disclosure of communications between the SEC and the DOJ finding that the proffer of evidence failed to indicate "that the SEC conducted its investigation into Kowalewski's violations of federal securities laws in order to pursue a criminal investigation in cooperation with the U.S. Attorney's Office." <u>Id.</u>, at *20.  The defendant's proffer included a claim by the defendant's attorney in the SEC investigation that the SEC attorney stated that the defendant needed to go jail and that the attorney would do his part to put him there.  <u>Id.</u>

AO 72A
(Rev.8/82)

### III.    Conclusion

The court, accordingly, **DENIES** the motion [Doc. 55] for disclosure of communications between the SEC and DOJ.

### Defendant Goldstein's Motion to Suppress Statement to SEC

At the time that the court preliminarily advised the parties that the court would be denying Defendants' request for disclosure of communications between the SEC and the DOJ, the court inquired as to whether Defendants sought to suppress, on other grounds, any statements made to or document production to the SEC.  Defendant Goldstein sought a hearing on the statement he made on June 30, 2010, to SEC staff attorney Brunson.  An evidentiary hearing was held on April 21, 2016.[8]  [Doc. 159]. In his post-hearing brief, primarily focusing on one statement made by Brunson concerning the confidentiality of the SEC investigation, Defendant contends that the statement to Brunson is inadmissible because the statement was involuntary.[9]  [Doc.

---

[8]Citations to the evidentiary hearing transcript are:  (Tr. at ).

[9]Defendant initially repeats his contention that the SEC and the DOJ investigations merged at some point and that he lacks any information about the status of the two investigations at the time of his June 30, 2010, conversation with Brunson. [Doc. 165 at 2-3].  However, as set forth in the preceding section, the criminal investigation did not commence (as Defendant is aware from the wiretap applications and affidavits) until August 2010.  Nothing in the *en camera* materials presented to the court evidenced any interaction between the SEC and the DOJ in June 2010 concerning

16

165]. The Government opposes suppression of the statement arguing that consideration of the totality of the circumstances demonstrates that the statement was voluntary. [Doc. 173]. After consideration of the argument of the parties and the record before the court, the court recommends that Defendant's motion to suppress be denied.

## I.    Background Facts

On or about June 30, 2010, Natalie Brunson, senior investigatory counsel for the SEC,[10] attempted to contact Defendant Goldstein by telephone, identifying herself as a SEC attorney and leaving a message for him to call her.  Around 2:00 p.m. on June 30, 2010, Defendant returned her call.  (Tr. at 5, 8-10, 13; Gov't Exh. 3).  According to Brunson, "This was the beginning . . . .  It was very early in the investigation, and [she] really was just reaching out to individuals to get - - to find out as much as [she] could about the company and . . . some certain individuals."  (Tr. at 16, 26, 29).  Brunson testified that she had no independent recollection of the conversation and that she was relying on her notes of the conversation and on her usual or standard practice

_____

the SEC civil enforcement investigation much less Brunson's intention to contact Defendant.

[10]Brunson began her employment with the SEC in February 2010.  (Tr. at 5).

17

in conducting telephone interviews to relate what transpired during the conversation with Defendant.  (Tr. at 6-7, 9, 11-12, 16-17).

With respect to voluntary interviews, Brunson begins a conversation by identifying herself and her title and advising that she is calling about an investigation but she has no specific recollection of the conversation with Defendant informing him that she was investigating MCGI for potential violations of securities law.  (Tr. at 20-21).  When conducting a voluntary interview, including by telephone,[11] Brunson's typical or general practice includes reading a Privacy Act script (Gov't Exh. 2) prior to the interview and then, at the conclusion of the interview, sending a letter with a copy of the SEC form 1662 (Gov't Exh. 1) to the individual.  (Tr. at 6-8, 17, 21).  The Privacy Act script is provided by the SEC and is read "to any witness [an SEC attorney is] contacting for an informal interview."  (Tr. at 7-8, 17; Gov't Exh. 2).[12]  Because she was new to the SEC, Brunson's "general practice" in June 2010 was "to stick very close

---

[11]Brunson explained that either the SEC issues a subpoena for testimony or she speaks to a witness "in an informal capacity, meaning we haven't subpoenaed them . . . ."  (Tr. at 6).  When asked if the interview with Defendant was "a formal interview," Brunson clarified that interviews are either voluntary or subject to a subpoena and that she would consider voluntary interviews informal.  (Tr. at 24-25).

[12]Brunson identified the document as "the language of the script that we read to witnesses prior to an informal interview."  (Tr. at 8).

18

[to the script] as in to read it word for word." (Tr. at 7, 19). As noted, Brunson testified that she had no independent recollection of reading the Privacy Act statement to Defendant Goldstein but stated, "it certainly would have been my standard practice at that time to, before  . . . taking a formal interview, to read these warnings, yes."[13] (Tr. at 10, 18-19). That statement reads as follows:

> It is part of our regular practice to provide certain information, which I'd like to review with you before we continue.
>
> My principle purpose in requesting information from you is to determine whether there have been violations of the statutes and rules that the Commission enforces. However, information provided by members of the public is routinely used by the Commission and other authorities, to conduct investigative, enforcement, licensing, and disciplinary proceedings, and to fulfill other statutory responsibilities.
>
> In general, the federal securities laws authorize the Commission to conduct investigations and to request information from you, but you are not required to respond. There are no direct sanctions and no direct effects upon you for refusing to provide information to me, but I would appreciate your cooperation.
>
> Even though you are not under oath, if you choose to answer questions, you must answer truthfully. It can be a criminal offense deliberately to provide false information to the staff of the SEC. You also have the right to have an attorney present.

---

[13]Based on Brunson's testimony about the distinction between formal, that is, subpoenaed, and informal, that is, voluntary, interviews (Tr. at 6-8, 24-25), the court believes that her use of the term "formal interview" is a misstatement.

19

> After we're finished with our discussion, I'll send you a more detailed explanation of the information I just told you.  May we continue?

(Gov't Exh. 2).[14]

Although, based on the Privacy Act statement, Brunson advises interviewees that the information provided would be used to determine whether there are violations of the securities laws and rules the SEC enforces, during the telephone call, she would not have advised Defendant that the information could be used by criminal law enforcement authorities.  (Tr. at 26-27).  And because it "was really early in the investigation[,]" Brunson would not have said anything to Defendant about whether she believed he violated any securities laws.  (Tr. at 26).

Brunson did not have any specific recollection of Defendant stating that he would continue the conversation; however, she has never continued an interview when an individual asked to terminate the conversation or declined an interview.  (Tr. at 11-12).  Because the conversation with Defendant continued, Brunson assumes that he agreed to the interview.  (Tr. at 12, 19, 21).  At the conclusion of the interview,

---

[14]Brunson's notes from the interview do not indicate that she read the Privacy Act statement to Defendant.  (Tr. at 17; Gov't Exh. 3).  When asked if her standard practice is to make a note of having read the Privacy Act to a witness, she responded, "It's not the typical - - it's something that I just do as a matter of course.  So I also don't write down that I sent the 1662.  It's just something I do, so I don't typically put that in my notes."  (Tr. at 19).

AO 72A
(Rev.8/82)

Brunson obtained Defendant's address, as noted on her interview notes, and mailed to him a form cover letter and the SEC form 1662. (Tr. at 10-11, 21; Gov't Exhs. 1, 3 and 4). She explains that she will be sending the Form 1662 that confirms things that were discussed but she does not typically read the form during the telephone conversation. (Tr. at 21-22).

> The letter mailed to Defendant states in pertinent part as follows:
>
> Thank you for taking the time today to speak with me, voluntarily, about your relationship with MedCareers Group, Inc. ("MCGI"). Per our discussion, please find enclosed for your review a copy of Commission Supplemental Information Form 1662, a statement of routine uses of information supplied to the Commission. As I explained, this inquiry is nonpublic and confidential . . . .

(Gov't Exh. 4).

Brunson was asked about the statement, "As I explained, this inquiry is non-public and confidential[,]" confirming something that she typically advises someone during an interview. (Tr. at 22-23). She responded, "Yes. I typically just explain that anything we've talked about, that I would appreciate if they don't, you know, speak with anyone else about it, that it's a non-public and confidential investigation." (Tr. at 23). Brunson, again, had no specific recollection of what she said to Defendant

Goldstein about this statement or of Defendant asking about the inquiry being non-public and confidential.  (Tr. at 23).

Additional facts will be set forth as necessary during discussion of Defendant's motion.

## II.  Discussion

Acknowledging that Defendant was not in custody during the June 30, 2010, telephone conversation with Brunson, Defendant nonetheless contends that the statement was involuntary due to Brunson's promise of "confidentiality" combined with her failure to disclose her "true intentions," apparently that the information supplied would be provided to prosecuting authorities, and the absence of any meaningful warnings, that is, that Defendant and MCGI were the targets of the SEC's investigation and to state more fully the information provided by the Form 1662 before conducting the interview.  [Doc. 165 at 8-19].  The Government responds that the totality of the circumstances surrounding the telephone conversation with Defendant establishes that he voluntarily agreed to the interview and was not promised that the information he provided would not be used against him.  [Doc. 173].

The Supreme Court has recognized "that . . . interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where

'the behavior of . . . law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined. . . .'" <u>Beckwith v. United States</u>, 96 S. Ct. 1612, 1617 (1976) (citation omitted).  Defendant contends that such "special circumstances" exist in the present case and that he was coerced into making the self-incriminating statements involuntarily.  As a result, it is the court's duty "'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'" <u>Id.</u> (quoting <u>Davis v. North Carolina</u>, 86 S. Ct. 1761, 1764 (1966)).  In determining whether a statement was made voluntarily, courts are to evaluate "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation." <u>Schneckloth v. Bustamonte</u>, 93 S. Ct. 2041, 2047 (1973).  Those cases where courts have found confessions to be involuntary "all have contained a substantial element of coercive police conduct." <u>Colorado v. Connelly</u>, 107 S. Ct. 515, 520 (1986).  "[F]actors taken into account have included the youth of the accused, . . . his lack of education, . . . or his low intelligence, . . . the lack of any advice to the accused of his constitutional rights, . . . the length of detention, . . . the repeated and prolonged nature of the questioning, . . . and the use of physical punishment such as the deprivation of food or sleep. . . ." <u>Schneckloth</u>, 93 S. Ct. at 2047 (citations omitted); <u>see also</u> <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1253 (11th Cir.

2003) ("Among the factors we must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police").  "However, 'while [courts] have enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent. . . .'"  Hubbard, 317 F.3d at 1253 (citation omitted).  The determinative question asked is whether there has been police overreaching.  See United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010).  "'Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'"  United States v. Thompson, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (citation omitted).

With respect to the primary issue before this court, that is, whether Brunson made a promise not to use Defendant's statements as inducement to obtain his cooperation, the Supreme Court has rejected any "suggestion of a per se rule that would render a confession involuntary if it was preceded by 'any direct or implied promises, however slight,'" instead, the issue of voluntariness remains based on an examination of the totality of the circumstances.  United States v. Lall, 607 F.3d 1277, 1285 (11th

24

Cir. 2010) (quoting <u>Bram v. United States</u>, 18 S. Ct. 183, 187 (1897), and citing <u>Arizona v. Fulminante</u>, 111 S. Ct. 1246, 1251 (1991)).  "The burden is on the prosecution to establish, by a preponderance of the evidence, that a challenged confession was voluntary." <u>Id.</u> (citing <u>Lego v. Twomey</u>, 92 S. Ct. 619, 627 (1972)).

In arguing that Defendant's statement to Brunson was involuntary because she allegedly promised him the conversation would remain confidential, and besides ignoring the other circumstances surrounding the interview, Defendant places his reliance on several cases, only one of which, <u>Lall</u>, provides binding legal authority. However, the facts in that case, and in <u>United States v. Walton</u>, 10 F.3d 1024 (3rd Cir. 1993), which the court in <u>Lall</u> found instructive, are factually inapposite to the facts the court finds established by a preponderance of the evidence in this case.  Although the court recognizes that Brunson lacked an independent recall of the details of the interview with Defendant Goldstein and based her testimony on the summary notes that she made during the interview and on her usual or standard practice when conducting voluntary interviews, the court finds her testimony - which is not disputed by other evidence presented at the hearing - credible and establishing the following facts.

On or about June 30, 2010, Brunson attempted to contact Defendant Goldstein by telephone, identifying herself as a SEC attorney and leaving a message for him to

call her, and, around 2:00 p.m. on June 30, 2010, Defendant returned her call.  (Tr. at

5, 8-10, 13; Gov't Exh. 3).  As was her practice, Brunson began the conversation by

identifying herself and her title and advising that she is calling about an investigation,

but she has no specific recollection for the conversation with Defendant informing him

that she was investigating MCGI for potential violations of securities law.  (Tr. at 20-

21).

And following her standard practice, in fact, the practice for the SEC when

conducting voluntary interviews, Brunson then read to Defendant the Privacy Act.  In

summary, Brunson informed Defendant that her purpose in requesting information from

him was to determine whether there have been violations of the statutes and rules that

the Commission enforces; that information provided by members of the public is

routinely used by the Commission and other authorities, to conduct investigative,

enforcement, licensing and disciplinary proceedings, and to fulfill other statutory

responsibilities; that, although the SEC may request information, Defendant was not

required to respond and there are no direct sanctions and no direct effects upon him for

refusing to provide information to her; that even though Defendant was not under oath,

if he chose to answer questions, he must answer truthfully because it can be a criminal

offense to deliberately provide false information to the SEC; and that he also had the

26

right to have an attorney present.  (Tr. at 6-8, 10, 17-19, 21; Gov't Exh. 2).  The fact that there is no notation regarding reading the Privacy Act recorded on the summary of Brunson's interview with Defendant does not support a conclusion that she deviated from this practice in this case.  As she explained, because reading the statement was standard practice, there was no reason to document doing so - just as she did not document sending the cover letter with the Form 1662.  (Tr. at 17, 19; Gov't Exh. 3).

Brunson's conclusion that, because the telephone conversation continued, Defendant agreed to speak to her is also supported by the reasonable inferences drawn from the evidence.  Defendant was asked, after being advised of the information in the Privacy Act, "May we continue?"  (Gov't Exh. 3).  Brunson stated that she has never continued an informal, voluntary interview if a witness declines.  (Tr. at 11-12, 19, 21).  And given the fact that all Defendant had to do to end the conversation was hang up the phone, the court concludes that Defendant agreed to speak with Brunson.

The interview lasted approximately twenty minutes.  (Gov't Exh. 3).  There is no evidence that Brunson threatened Defendant.  With respect to the line in the form letter sent to Defendant after the interview that, as they had discussed, the "inquiry was nonpublic and confidential," Brunson testified, "Yes.  I typically just explain that anything we've talked about, that I would appreciate if they don't, you know, speak

27

with anyone else about it, that it's a non-public and confidential investigation." (Tr. at 23). This statement is not her unexpressed understanding but is the explanation of "non-public and confidential" provided to interviewees. Although Brunson had no specific recollection of what she said to Defendant Goldstein about the statement in the letter or of Defendant asking about the inquiry being non-public and confidential, there is also no other evidence before the court that Brunson did not provide Defendant her typical explanation or that she made any promises to Defendant that what he said to her would not be used either in civil or criminal proceedings. (Tr. at 23).

In Lall, the court found the defendant's statement to law enforcement involuntary but under significantly different circumstances. The court found that the officer "explicitly assured Lall that anything he said would not be used to prosecute him." 607 F.3d at 1287. Additionally, both the defendant and the officer testified that the officer told the defendant that "he would not be charged for any statements or evidence collected" at that time. Id. Local authorities did not charge the defendant; however, federal authorities using his statements did charge him. Id. The court found "inconceivable that Lall, an uncounseled twenty-year-old, understood at the time" that

28

the promise applied only to state and not to federal authorities.[15]  Id. at 1287.  And in Walton, relied on by the court in Lall, the facts underlying the finding of involuntariness differs significantly from those in this case.  In Walton, the court first found significant that the agent referenced his prior relationship with the defendant "as a basis for inviting Walton to speak to the agents 'off the cuff.'"  10 F.3d at 1030.  And, as in Lall, the agent's testimony corroborated the defendant because he testified that he told Walton "that he had given . . . his 'word' [that the agents] weren't going to use this against him.'"  Id. (no citation).  The court also found that the day before the statement the agents "had deliberately withheld" from the defendant their suspicions about his criminal wrongdoing, instead leading him to believe they were solely conducting a regulatory inspection.  Id.

In this case, Defendant Goldstein, an adult, apparently educated, businessman, was advised about the potential uses of the information that he may provide, that, although his cooperation was voluntary, if he deliberately lied to Brunson, he could be charged, that he would not suffer adverse consequences if he declined to speak to her,

_____

[15]The court had also noted in finding that the defendant's waiver of Miranda rights was involuntary that the defendant had been "kept alone in his bedroom, isolated from his family, and told that the purpose of any questioning was to protect [his] family from future harm."  Id. at 1284.

and that he could have an attorney present.  (Tr. at ; Gov't Exh. 2).  The interview, over the telephone - allowing Defendant to terminate the interview by simply hanging up - lasted approximately twenty minutes.  (Gov't Exh. 3).  The evidence also does not support a finding that Brunson misled Defendant.  Defendant was not told that the information he provided was confidential.  Even if nothing else was said during the interview other than the statement in the letter, that is, that "the *inquiry* is nonpublic and confidential," in light of the other guidance provided by Brunson, no reasonable person would have understood that he was being promised that *what he said* was confidential, that is, could not be used against him.  However, Brunson did testify that this statement is typically explained during the interview by her saying "that anything we've talked about, that I would appreciate if they don't, you know, speak with anyone else about it, that it's a non-public and confidential investigation."  (Tr. at 23).  No evidence refutes her practice being followed in this case.

And, contrary to Defendant's argument, Brunson was not deceptive in failing to provide Defendant the Form 1662 prior to the interview and in failing to advise Defendant that he was the target of the SEC investigation and that his statements could be relayed to prosecuting authorities and used against him.  [Doc. 15].  As Brunson made very clear, "This was the beginning . . . .  It was very early in the investigation,

30

and [she] really was just reaching out to individuals to get - - to find out as much as [she] could about the company and . . . some certain individuals." (Tr. at 16, 26, 29). Due to the early stage of the investigation, she had not determined that any violations had occurred and would not have, accordingly, told Defendant that she thought he or MCGI had committed any offenses. (Tr. at 26). And, as hard as Defendant might try to infer to the contrary, absolutely nothing in the record indicates that Brunson, at the time of the interview, intended to relay to prosecuting authorities Defendant's statements and declined to so advise him. The Government's investigation did not open until over a month after Defendant's interview. As Defendant concedes and the court's *en camera* inspection corroborates, Brunson did not interact with prosecuting authorities until mid-to-late August 2010. In response to cross-examination, Brunson reinforced this conclusion. Defendant' counsel asked in connection with determining what she may have written about the interview at the time: "No e-mails written about the substance of the call afterwards in response to *Government* inquiry about having to have an interview, nothing like that?" (Tr. at 28) (emphasis added). Brunson responded, "Not that I recall. And at the time this didn't - - I mean, it was a pretty routine interview for me. I mean, there was no need at that time that I knew of to write any memo or e-mail." (Tr. at 28). Brunson was not acting at the behest of any other

AO 72A
(Rev.8/82)

governmental entities; she was conducting the SEC inquiry and following her routine practice.

Furthermore, Defendant misconceives the nature of the evidence that must be produced by him to establish deception that would undermine the voluntariness of his statements during the interview based on the subsequent sharing of information between the SEC and the DOJ.  The proof presented must establish affirmative misrepresentation, trickery or deceit by the SEC in conducting civil discovery during the civil litigation.  In Stringer, the Ninth Circuit Court of Appeals stated:

> A government official must not "affirmatively mislead" the subject of a parallel civil and criminal investigations "into believing that the investigation is exclusively civil in nature and will not lead to criminal charges." . . .  However, "we have consistently held that the failure of an IRS agent . . . to warn a taxpayer that an audit may have potential criminal ramifications does not render the search unreasonable." . . .  Other circuits have agreed that Fourth Amendment and possible due process limitations may be implicated in a dual investigation. . . .  Almost every other circuit has denied suppression, even when the government agents did not disclose the possibility or existence of a criminal investigation, so long as they made no affirmative misrepresentations.

535 F.3d at 940 (citing, *inter alia*, United States v. Wuagneux, 683 F.2d 1343, 1347 (11th Cir. 1982)); see also United States v. Posada Carriles, 541 F.3d 344, 355-56 (5th Cir. 2008) (citing cases, including United States v. Tweel, 550 F.2d 297 (5th Cir. 1977), affirming in parallel investigations "that a government official may not make 'material

misrepresentations' about the nature of the investigation or inquiry," but showing "that the burden is on the subject of the investigation to prove that such misrepresentations were made," and demonstrating "that we have consistently adhered to the rule, discussed in <u>Tweel</u>, that the 'mere failure' of a government official to warn that an investigation may result in criminal charges does not constitute fraud, deceit, or trickery") (citations omitted).

In <u>Tweel</u>, the revenue agent began and conducted the civil tax audit at the specific request of criminal investigators. <u>Tweel</u>, 550 F.2d at 298. The defendant's representative specifically asked the revenue agent if a special agent was involved in the audit, and the revenue agent responded in the negative leading the defendant's representative to believe the agent was conducting a routine civil tax audit. <u>Id.</u> Thereafter, the representative supplied documents in response to the revenue agent's requests. <u>Id.</u> Based on these facts, the Court held "that the agent's failure to apprise the appellant of the obvious criminal nature of this investigation was a sneaky deliberate deception by the agent . . . and a flagrant disregard for [the defendant's] rights." <u>Id.</u> at 299. The facts in <u>Tweel</u> are inapposite to those before this court, that is, the SEC litigation was not instituted at the request of the U.S. Attorney's Office, there is no evidence that Brunson was asked if a criminal investigation was pending or

AO 72A
(Rev.8/82)

possible or that Brunson misrepresented the possibility of such an investigation, or otherwise in engaged in deception or trickery.  And Brunson was not required to provide Defendant with details about the nature of her investigative inquiry.  See United States v. Barner, 572 F.3d 1239, 1244 (11th Cir. 2009) ("the Supreme Court has 'never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights'") (citation omitted).  Quite simply, Brunson "did not engage in the type of out-and-out deception found by the Eleventh Circuit to render a statement involuntary in [Lall]."  United States v. Varnell, 2014 WL 5517923, at *1 (N.D. Ga. October 28, 2014).

Although the court will not address the remaining, non-binding federal cases cited by Defendant in detail, the facts in those cases are inapposite to those before this court.[16]  In United States v. Swint, 15 F.3d 286 (3rd Cir. 1994), the court found that local officers understood along with the defendant that his statement was an "off-the-record proffer" for cooperation in exchange for a plea but that federal agents then entered the picture and obtained statements that the agents did not intend to be off-the-record although the defendant was not so informed.  Id. at 289-90.  The court found that the

---

[16]The same is true of the state court cases cited by Defendant.

34

officers and agents engaged in misleading conduct, "a coercive 'bait-and-switch' technique" that undermined the voluntariness of the defendant's statements. Id. at 290-91.  In United States v. Conley, 859 F. Supp. 830 (W.D. Pa. 1994), the court found the defendant's statement involuntary based on the facts that both the defendant and the agent "understood that nothing said would be used against" the defendant, that this promise was "express and direct" and that the agent's friendly demeanor set the stage for causing the defendant to trust the agent.  Id. at 837-38.  These facts overrode the defendant's prior "manifest reservations" about giving a statement.  Id. at 838.  The factors relied on by the courts in Swint and Conley to find the defendants' statement involuntary simply are not present in this case.

The totality of the circumstances surrounding Defendant's twenty minute, non-confrontational telephone interview with Brunson on June 30, 2010, establish by preponderance of the evidence that Defendant's statement was voluntary.  There is no evidence of governmental coercion or overreaching that would support a finding to the contrary.

35

## III.    Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 55] to suppress his statement based on voluntariness be **DENIED**.

### Defendants' Motions to Suppress Physical Evidence

The last motions pending before the court are Defendant Goldstein's motion [Doc. 47] to suppress evidence, the contents of three Blackberry cellular telephones and computer files containing Blackberry cellular telephone data on a thumb-drive, provided to the Government by a cooperating source, Marc Rosenberg.[17]  The thumb-drive also appears to contain computer files of materials that originated on a computer owned and operated by Defendant Goldstein; Defendant likewise seeks to suppress that evidence.  And the thumb-drive appears to contain computer files of materials that originated on a computer owned and operated by Defendant Bercoon.  When Defendant Bercoon was so informed, the court granted Defendant time to review the contents of

---

[17]As will be discussed *infra*, when Defendant initially filed the motion to suppress, the Government was only in possession of two of the three cellular telephones at issue.  After Rosenberg turned over the third telephone and the thumb-drive containing computer files to the Government, the court treated the pending motion to suppress as covering the additional items and materials.

AO 72A
(Rev.8/82)

the thumb-drive and to file a motion [Doc. 147] to suppress that information.  Four evidentiary hearings were held on Defendants' motions to suppress.

With respect to the first two Blackberry cellular telephones, the Government received a Blackberry Bold on February 1, 2011, with the Government extracting limited data from the cellular telephone on February 25, 2011, and received a Blackberry 8310 Curve on February 28, 2011, with the Government extracting limited data from the cellular telephone on March 25, 2011.  On August 20, 2015, a Blackberry 8700C (the Government extracting data from that telephone on October 20, 2015) and the thumb-drive containing the computer files were turned over to the Government.[18]  Evidentiary hearings on Defendant Goldstein's motion [Doc. 47] to suppress were conducted on the searches of the cellular telephones and related to the thumb-drive files containing the cellular telephone data on August 20, 2015 [Doc.

_____

[18]Three additional cellular telephones were turned over by Rosenberg; however, no data could be extracted from the Skytell cellular telephone associated with Defendant Goldstein.  With respect to the cellular telephone data on the thumb-drive, the Government has advised the court and the parties that it has not yet accessed the computer files containing that information.  [Doc. 197 at 4].  It is not clear to the court whether the federal prosecutors and agents directly involved in the investigation and prosecution of this case have accessed and examined any of the files contained on the thumb-drive including those that might have originated from Defendants Bercoon's and Goldstein's computers.  (2/3/16 Tr. at 39-40).

110],[19] on October 27, 2015 [Doc. 120],[20] and on February 3, 2016 [Doc. 136].[21]  Once it became apparent that the thumb-drive also contained computer files originating from Defendants Bercoon's and Goldstein's computers, a fourth evidentiary hearing was conducted on May 23, 2016, on both Defendants' motions [Docs. 47 and 147] to suppress.  [Doc. 171].[22]

In support of Defendant Bercoon's motion to suppress the materials and information contained on the thumb-drive that originated on his computer, Defendant challenges the warrantless search contending that (1) the Government's search of the files exceeded the scope of any private search conducted by Rosenberg simply because Rosenberg conducted no search of any of the files relating to Defendant turned over on the thumb-drive and (2) Defendant did not abandon the files found on the thumb-drive originating from his computer.  [Doc. 175].  In support of Defendant Goldstein's motion to suppress the data remaining on the three Blackberry cellular telephones and to suppress the cellular telephone data and the materials that originated on his computer

---

[19]Citations to this transcript are:  (8/20/15 Tr. at ).

[20]Citations to this transcript are:  (10/27/15 Tr. at ).

[21]Citations to this transcript are:  (2/3/16 Tr. at ).

[22]Citations to this transcript are:  (5/23/16 Tr. at ).

AO 72A
(Rev.8/82)

contained on the thumb-drive, Defendant challenges the warrantless searches contending (1) that he did not abandon his legitimate expectation of privacy in the data and files and that Rosenberg's limited access to the information did not undermine Defendant's privacy interests in the data and files and (2) that Rosenberg lacked actual or apparent authority to consent to searches of the Blackberry cellular telephones and the information on the thumb-drive. [Doc. 176].

In response, the Government advised that it will not introduce at trial the image of Defendant Bercoon's personal computer that Rosenberg copied on to the thumb-drive produced to the Government. [Doc. 192 at 2 n.1]. The Government subsequently appeared to limit this statement to files that "appear to be contained in a folder labeled 'marc b docs' on the thumb-drive" and to exempt from the restriction files accessed if a search warrant is obtained for the thumb-drive. [Id. at 19-20 & n.6]. As to the files on the thumb-drive originating from Defendant Goldstein's computer, the Government made no arguments opposing suppression of this information and only stated that no file is identified on the thumb-drive named "Will" which allegedly contains this information. [Id. at 19 & n.5]. On this basis, the Government contends that Defendant

39

Bercoon's motion to suppress is moot.  [Id. at 2 n.1].[23]  The court requested that the Government clarify what information found on the thumb-drive will not be used at trial and to state if the non-use of the information extends beyond the Government's case-in-chief.  Because the Government's response [Doc. 197] did not fully delineate what materials were included and to what extent the information would not be used at trial, the court sought and obtained the Government's stipulation as follows:

> The Government does not intend to introduce at trial or in the cross-examination of any witness (**excepting** if the Defendants testify, under the impeachment exception to the exclusionary rule, if applicable, or if the Government obtains a search warrant for the materials) **ANY** materials contained on the thumb-drive that originated from the computer of either Defendant Bercoon or Defendant Goldstein and, on that basis, the Government requests that the court find Defendants' motions to suppress **ANY** data originating from either Defendants' computer now found on the thumb-drive moot.[24]

Based on this stipulation, the court recommends that Defendant Bercoon's motion [Doc. 147] to suppress any materials contained on the thumb-drive that originated from

---

[23]Defendant Bercoon objects to this treatment of his motion to suppress.  [Doc. 194].

[24]In James v. Illinois, 110 S. Ct. 648 (1990), the Supreme Court noted that it had "carved out exceptions to the exclusionary rule" one of which "permits prosecutors to introduce illegally obtained evidence for the limited purpose of impeaching the credibility of the defendant's own testimony."  Id. at 651; and see United States v. Lynch, 934 F.2d 1226, 1234 n.10 (11th Cir. 1991) (same); United States v. Bergin, 732 F. Supp. 2d 1235, 1242 (M.D. Fla. 2010) (same).

AO 72A
(Rev.8/82)

his personal computer be denied as moot and that Defendant Goldstein's motion [Doc. 47] to suppress any materials contained on the thumb-drive that originated from his personal computer be denied as moot.

In opposition to Defendant Goldstein's motion to suppress the data remaining on the three Blackberry cellular telephones and the cellular telephone data files contained on the thumb-drive, the Government, acknowledging that Defendant had a reasonable expectation of privacy in the cellular telephones and the data in the files on the thumb-drive, argues (a) that Defendant abandoned the cellular telephones and the cellular telephone data on the thumb-drive Rosenberg turned over to the Government and, in the alternative, if the court finds that Defendant retains a legitimate expectation of privacy, (2) that the Government reasonably believed that Rosenberg had apparent authority to consent to the searches of the cellular telephones and the thumb-drive. [Doc. 192]. In reply, Defendant Goldstein argues that the Government did not satisfy its burden to prove that Defendant abandoned his legitimate expectation of privacy in the data on cellular telephones or in the cellular telephone data on the thumb-drive and that the Government did not carry its burden of proving that Rosenberg had apparent authority to consent to a search of these items. [Doc. 198].

41

After consideration of the record before the court and the arguments of the Government and Defendant Goldstein, the court finds that the Government did not establish that Defendant abandoned his legitimate expectation of privacy in the data remaining in the Blackberry cellular telephones or contained in the computer files on the thumb-drive and that the Government did not establish that the agents had a reasonable and good faith belief that Rosenberg had apparent authority to consent to the search of the cellular telephones. Because, as stated by the Government [Doc. 197 at 4], no search has been conducted of the cellular telephone data on the thumb-drive, the court will not address Rosenberg's consent to search those files. For these reasons, the court recommends that Defendant Goldstein's motion to suppress fruits of the searches of the three cellular telephones be granted.

## I.     Background Facts

Sometime in August 2010, Harold Mark Rosenberg began cooperating with the Government in the securities fraud investigation related to the operation of Defendants Bercoon's and Goldstein's businesses. (8/20/15 Tr. at 4-4; Gov't Exh. 1). Rosenberg, who had maintained a close friendship with Defendant Goldstein for over thirty years, began working in 2006 as Defendant's personal assistant and handling various administrative tasks in the businesses operated by Defendants Bercoon and Goldstein

AO 72A
(Rev.8/82)

until his employment ended sometime in July 2010.  They trusted each other.  (8/20/15 Tr. at 5, 14-17).  Rosenberg advised federal agents that one of his tasks was to transfer cellular telephone data when Defendant Goldstein either wanted to upgrade his Blackberry or had to obtain a new Blackberry due to damage to his existing telephone.[25] In handling the cellular telephones, Rosenberg followed Defendant Goldstein's instructions; he did not have any discretion concerning the telephones; he protected the data on the telephones; and he did nothing to compromise the personal and business information on the telephones.  (8/20/15 Tr. at 5-6, 19, 21-22).  Defendant Goldstein used the Blackberry cellular telephones for personal and business telephone calls, texts and emails.  (8/20/15 Tr. at 15, 18).

The usual procedure followed by Rosenberg was to obtain a new Blackberry from the AT&T store.[26]  While at the office, he plugged Defendant's old Blackberry

_____

[25]Rosenberg performed the same task for Defendant Goldstein's wife and for Defendant Bercoon.  (8/20/15 Tr. at 19).

[26]All of the Blackberry cellular telephones were registered to one of Defendants Bercoon's and Goldstein's businesses, NPorta.  Although not clear why, Rosenberg's name and social security number was associated with the account on the billing records, which Defendant Bercoon addressed when a billing issue came up.  (8/20/15 Tr. at 42-43).

43

into his, Rosenberg's, personal computer[27] and, using Blackberry Desktop software, downloaded the data from the old Blackberry.  Defendant Goldstein would provide his password for the cellular telephone only to allow Rosenberg access for this transfer process.[28]  After downloading the data, Rosenberg unplugged the old Blackberry and plugged in the new Blackberry to upload the data onto that cellular telephone.[29]  (8/20/15 Tr. at 5-7, 9, 20, 21-22, 24-27).  Rosenberg never accessed or modified the data remaining on the old Blackberry, remaining on his computer as part of the transfer process, or now on the new Blackberry.  (8/20/15 Tr. at 7, 9).  Rosenberg never used

---

[27]Rosenberg used his personal computer for all of his business-related work for Defendants.  (8/20/15 Tr. at 24-26).

[28]The data on the cellular telephones provided to the Government was password protected.  (8/20/15 Tr. at 21).  Rosenberg did not have any independent recollection of the passwords used by Defendant Goldstein nor recall advising federal agents of any passwords that would unlock the Blackberry telephones, but, if he had recalled the passwords at the time he produced the cellular telephones, he would have told the agents but no one else.  (8/20/15 Tr. at 9-11).  However, for one the passwords used by the Government to access the cellular telephones, Rosenberg recalled that the digits, 4160, were part of the address for Defendant Goldstein's father, and for another password, BANKS, Rosenberg recalled generally that Defendant did use that word as a password and told the Government.  (8/20/15 Tr. at 35-36, 38).

[29]The old Blackberry had data in hard storage in the cellular telephone's memory which was transferred to the new telephone.  (8/20/15 Tr. at 20-21).  The old cellular telephone also contained a "Sim" card that was transferred to the new Blackberry to allow Defendant Goldstein to keep the same telephone number.  (Tr. at 13, 20-21).

AO 72A
(Rev.8/82)

Defendant's cellular telephones or searched the data on the telephones.  (8/20/15 Tr. at 17).[30]

Rosenberg was not sure how much knowledge Defendant Goldstein had about the cellular telephone data transfer process but thought that he should have known about the back-up cellular telephone data files on his, Rosenberg's, computer.  (8/20/15 Tr. at 32-33).  Rosenberg did testify, "I know I did give him copies of the [computer] files that I created in case he ever needed them for anything."  (8/20/15 Tr. at 32).  Rosenberg stated that he kept those files for Defendant Goldstein and not for himself and that he did not use the data or give the data to any third parties because the data belonged to Defendant.  (8/20/15 Tr. at 32).

Once the transfer of data was complete, Rosenberg described the old cellular telephone as, "Essentially it's a dead phone, and the new one replaces it."  (8/20/15 Tr. at 20).  Rosenberg asked Defendant Goldstein if he could keep the old Blackberry cellular telephones for his infant-toddler daughter to play with, and Defendant allowed Rosenberg to keep the old cellular telephones for that purpose.  (8/20/15 Tr. at 7).  Rosenberg never charged or accessed or unlocked the old cellular telephones that his

---

[30]If Rosenberg could not transfer the data for some reason, he took the Blackberry to the AT&T store for the process to be completed.  (8/20/15 Tr. at 24).

45

daughter played with.  He also made sure that the telephones were not lost.  (8/20/15 Tr. at 7-8, 12, 28-29).  And Rosenberg kept an old Blackberry in his desk at the office in case of emergency and Defendant Goldstein needed a cellular telephone.  (8/20/15 Tr. at 28).  Defendant never asked that the old cellular telephones be returned to him. (8/20/15 Tr. at 10; 2/3/16 Tr. at 22).

Rosenberg had very minimal recall about the cellular telephones that he provided to the Government but stated that he turned them over because there "maybe data on there that they can use . . . ."  (8/20/15 Tr. at 8-9, 13).  He was not sure if he gave the telephones directly to the Government or his attorney turned them over.  (8/20/15 Tr. at 8-9, 11-12).  Rosenberg intended for the Government to access the data, if any, remaining on the cellular telephones.  (8/20/15 Tr. at 13).  He did not recall the dates that he provided the telephones to the Government and did not know whose telephones he was turning over.  (8/20/15 Tr. at 8-9, 12-14, 31).  The record is not clear what the agents asked Rosenberg about the old Blackberry cellular telephones or what he told them.  Apparently, however, he told the agents that he transferred data from the old telephones to new telephones and that he did not have any idea whose telephones he was giving to them.  (8/20/15 Tr. at 5-6, 12-13, 38).  Rosenberg could not recall what he told the federal agents regarding Defendant's instructions about the telephones or

AO 72A
(Rev.8/82)

even being asked by the agents about Defendant's instructions.  (8/20/15 Tr. at 33-35).
At the first meeting with the agents, apparently on August 30, 2010, they asked
Rosenberg to locate any documents that he had and to turn those over to them.  (8/20/15
Tr. at 38-41).  In response, Rosenberg turned over - at various times - Defendant's three
Blackberry cellular telephones and the thumb-drive.  (8/20/15 Tr. at 38-41).

Federal Bureau of Investigation ("FBI") Special Agent Wallace Taylor testified
that his first conversation with Rosenberg was in August 2010 and that he did not recall
any specific conversation about the Blackberry cellular telephones.  (8/20/15 Tr. at 45-
46).  He also testified about meeting with Rosenberg and his attorney on February 1,
2011, and receiving the Blackberry Bold cellular telephone from Rosenberg's attorney.
At that meeting, Rosenberg advised "[t]hat he had the responsibility as an employee to
occasionally exchange phones, upgrade phones for Mr. Goldstein and Mr. Bercoon and
several other employees."  (8/20/15 Tr. at 46-47; Gov't Exh. 2).  On February 28, the
agent received a Blackberry 8310 from Rosenberg's attorney.  (8/20/15 Tr. at 47-48;
Gov't Exh. 3).  Using a program called Cellebrite, on February 25, 2011, and March
25, 2011, the agent accessed some of the data on the telephones which Rosenberg
provided to the Government as part of his cooperation agreement.  The information

47

accessed indicated that each telephone sent or received the last text message on August 3, 2010.  (8/20/15 Tr. at 50-51, 53-55).[31]

On August 20, 2015, the date of the first evidentiary hearing, Rosenberg provided to FBI Special Agent William Cromer four additional cellular telephones and a thumb-drive.  (2/3/16 Tr. at 3-4).  As noted, when the agent attempted to extract information using the Cellebrite program on October 20, 2015, he was only able to access data on the Blackberry 8700C which Defendant Goldstein appeared to have used from March to June 2009.  (2/3/16 Tr. at 6-7, 13-18; Gov't Exh. 20).  The agent discussed these cellular telephones and thumb-drive with Rosenberg on October 20, 2015.  Rosenberg said that he found the additional telephones when moving stuff and that he was not sure to whom the telephones belonged except for the old Skytell which he received from Defendant Goldstein to discard.  He also advised that the information on the thumb-drive had been transferred from his, Rosenberg's, computer and that he was not sure what was in the files he transferred to the thumb-drive.  (2/3/16 Tr. at 5-6, 10-12).

---

[31]A more thorough analysis of the data on the two Blackberry cellular telephones was conducted by Jim Persinger on behalf of Defendant Goldstein using the same Cellebrite program.  (10/27/15 Tr. at 60, 66-67).  The analysis indicated that the data remaining on the telephones included business and personal text messages, emails and photographs.  (10/27/15 Tr. at 68-95).

AO 72A
(Rev.8/82)

Rosenberg advised Agent Cromer that he had obtained the cellular telephones in order to upgrade to new telephones during his work with Defendant's business just like the Blackberry Bold and Blackberry 8310 and that he possessed the telephones for that purpose.  (2/3/16 Tr. at 12-13, 16, 18).  The agent did not ask Rosenberg any details about Defendant Goldstein's instructions regarding the Blackberry telephones except that Defendant Goldstein told Rosenberg to download information and transfer that information to the new telephone.  (2/3/16 Tr. at 19).  Rosenberg also advised that his child played with the old cellular telephones and that the telephones were never turned on, were dead and were not charged.  Rosenberg advised that he "would protect the data on the phones."  (2/3/16 Tr. at 20).  The agent had to charge the telephones before extracting the data.  (2/3/16 Tr. at 20).  The agent did not ask Rosenberg to create the thumb-drive, and Rosenberg did not advise when he did so.[32]  (2/3/16 Tr. at 21).

Rosenberg testified to the following information about the cellular telephones and thumb-drive provided to the Government on August 20, 2015, and to additional information about his access to the data on the devices.  Rosenberg confirmed that he

---

[32]Rosenberg confirmed that he decided to create the thumb-drive in response to the Government's request for any documents or files that he still had from his employment with Defendants.  (2/3/16 Tr. at 30-32).

was not sure to whom the three Blackberry cellular telephones turned over in August 2015 belonged but that he possessed the old telephones and the files of cellular telephone data transferred to the thumb-drive for the same reason he possessed the previously turned over telephones, to upgrade to a new telephone - a process that he would complete in just a few minutes because Defendant Goldstein wanted his new telephone as soon as possible.[33]   (2/3/16 Tr. at 26-29, 30-31).   After leaving Defendant's employment, Rosenberg did not upgrade any more telephones nor acquire any additional old telephones.  (2/3/16 Tr. at 30-31).  Rosenberg also confirmed that the data on the cellular telephones "wasn't [his] stuff so [he] never went through it" and that his "ability to access the data on those phones was limited to upgrading the phone . . . ." (2/3/16 Tr. at 33).  Transferring the data from an old cellular to the new cellular telephone "was the only permission [he] had to access the data from Mr. Goldstein . . . ." (2/3/16 Tr. at 33).  In fact, the data files, as Rosenberg understood, on the cellular telephones and on the computer files created when the data was transferred was encrypted, and he had no idea how to access the data.  (2/3/16 Tr. at 33-34).  Rosenberg stated that it was "nobody's business what was on" the old telephones and that he did

---

[33]The files containing the cellular telephone data from the upgrading process may include files for additional cellular telephones not turned over the Government but Rosenberg was not sure because he did not access the files.  (2/3/16 Tr. at 31, 35-36).

not recall ever advising Defendant that, after downloading the data from the old cellular telephones, "the old phone[s] maintained all the data on them . . . ." He did not know what Defendant knew. (2/3/16 Tr. at 35-36).

Generally, with respect to the thumb-drive, during the time he worked for Defendants Bercoon and Goldstein, Rosenberg acquired files from their computers to perform his duties but he did not access the content of the files and simply copied over entire files to the thumb-drive that he believed were associated with either Defendant. (5/23/16 Tr. at 5-8). Rosenberg also recalled one occasion, at Defendant's request, using one of the cellular telephone data files he kept on his computer to transfer the most recent data available to a new Blackberry for Defendant Goldstein. Defendant's old telephone fell into the toilet, and the data on that telephone could not be transferred to the new telephone.[34] (5/23/16 Tr. at 9-10, 39-40). Rosenberg's testimony about Defendant Goldstein's knowledge or lack of knowledge about the back-up cellular data files on Rosenberg's computer is conflicting and vague. Besides the incident with the

---

[34]When asked at an earlier hearing whether Defendant Goldstein had ever requested that the back-up telephone data be used when he lost or damaged a cellular telephone, Rosenberg only mentioned an incident "before Blackberries" involving an old flip phone. Defendant needed the contact numbers from the telephone, and Rosenberg printed out the numbers for him. (2/3/16 Tr. at 36-37; 5/23/16 Tr. at 9, 39-41).

AO 72A
(Rev.8/82)

"toilet" telephone, Rosenberg had no specific recollection of discussing the files with Defendant, and he suspected, but did not know, that Defendant was aware of the back-up files on the computer. (5/23/16 Tr. at 42-45). Rosenberg repeated that Defendant Goldstein never asked Rosenberg to return the old cellular telephones and that he did not ask Rosenberg to delete the telephone data on his computer. (5/23/16 Tr. at 10).

The cellular telephone data on the thumb-drive was created during the transfer process of data from the old Blackberry cellular telephones to the new telephones. (5/23/16 Tr. at 32-35). Rosenberg repeated that he did not look at or open the back-up data files and did not know how to open the files. His "only task was to transfer [the data] from one phone to the other[,]" and it "just happen[ed]" that a copy remained on his computer. Neither he nor Defendant made the choice for a file to be created and remain on Rosenberg's computer; however, Rosenberg guarded the information and did not disseminate it to any third parties before providing the thumb-drive to the Government. (5/23/16 Tr. at 37-38). The transfer process usually was completed in just a few minutes because Defendant wanted his telephone. (5/23/16 Tr. at 45).

Additional facts will be set forth as necessary during discussion of Defendant Goldstein's motion to suppress.

52

## II.     Discussion

### a.     Legitimate Expectation of Privacy-Abandonment

The first issue for the court to resolve is whether Defendant Goldstein abandoned his legitimate expectation of privacy in the contents of the three Blackberry cellular telephones and in the contents of the back-up cellular telephone data files transferred from Rosenberg's computer to the thumb-drive.  To determine whether an individual may challenge a search, the court must decide "whether the individual maintains a legitimate expectation of privacy in the object of the search."  United States v. Hastamorir, 881 F.2d 1551, 1559 (11th Cir. 1989).  It is Defendant Goldstein's burden to prove that he had a legitimate expectation of privacy in the cellular telephones and back-up files on the thumb-drive.  See United States v. Cooper, 203 F.3d 1279, 1283-84 (11th Cir. 2000).  Making this determination involves a two-part inquiry:  (1) "whether the individual has manifested 'a subjective expectation of privacy in the object of the challenged search[,]' . . . [and (2)] whether society is willing to recognize the individual's expectation of privacy as legitimate."  Hastamorir, 881 F.2d at 1559 (citation omitted).

The Government does not challenge Defendant's legitimate expectation of privacy when he originally possessed and used the three Blackberry cellular telephones

53

AO 72A
(Rev.8/82)

and when the data contained on those - and potentially other cellular telephones - was transferred from old cellular telephones to new cellular telephones initially creating the back-up files on Rosenberg's computer.   [Doc. 192].   And the court finds that Defendant had a reasonable expectation of privacy in these items.   In <u>Riley v. California</u>, 134 S. Ct. 2473 (2014), the Supreme Court declined to extend the search incident to arrest exception to the exclusionary rule to cellular telephones and held "that a warrant is generally required before a . . . search, even when a cell phone is seized incident to arrest." 134 S. Ct. at 2493.  In reaching this conclusion, the Court's opinion focused on the extensive amount of personal data maintained on cellular telephones. The Court stated, "Cell phones differ in both a quantitative and qualitative sense from other objects that might be kept on an arrestee's person. . . .  One of the most notable distinguishing features of modern cell phones is their immense storage capacity." <u>Id.</u> at 2489; <u>and see</u> <u>United States v. Dixon</u>, 984 F. Supp. 2d 1347, 1352-53 (N.D. Ga. 2013) (finding that privacy interests in today's cellular phones, which "are in effect mini-computers" and contain "a wealth of private information[,]" require a search warrant to search for that information).  Accordingly, as is true of a number of courts, this court finds that "[a]n owner of a cell phone generally has a reasonable expectation of privacy in the electronic data stored on the phone." <u>United States v. Qunitana</u>, 594

AO 72A
(Rev.8/82)

F. Supp. 2d 1291, 1299 (M.D. Fla. 2009); and see United States v. Mitchell, 2013 WL 3808152, at *6 (M.D. Fla. July 22, 2013) ("Although the exact nature and extent of an individual's privacy interest in cell phones and electronic devices may be unclear, a number of courts have recognized that 'individuals retain a reasonable expectation of privacy in the information stored in their cell phones.'") (quoting United States v. Cole, 2010 WL 3210963, at *16 (N.D. Ga. August 11, 2010)).  And the same reasoning applies to the cellular telephone data captured in the back-up files during the data transfer process.

However, "[l]egitimate expectations of privacy can be abandoned."  United States v. McKennon, 814 F.2d 1539, 1545 (11th Cir. 1987).   The question of abandonment is one of intent "which can be inferred from words, acts and other objective facts." Id. at 1546; and see United States v. Sparks, 806 F.3d 1323, 1342 (11th Cir. 2015) (this is an objective assessment "based primarily on the prior possessor's intent").  And "the issue of abandonment for Fourth Amendment standing purposes is not abandonment in the 'strict property-right sense'" but is evaluated applying a "'common sen[s]e approach[.]'" Sparks, 806 F.3d at 1342 (citations omitted).  "[T]he critical inquiry is 'whether the person prejudiced by the search . . . voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question

55

so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*.'" McKennon, 814 F.2d at 1546 (quoting United States v. Pirolli, 673 F.2d 1200, 1204 (11th Cir. 1982)) (emphasis in original).  In making this determination, "events that occurred after the abandonment may be considered by the court as evidence of the defendant's intent to abandon the property at the previous time." United States v. Winchester, 916 F.2d 601, 604 (11th Cir. 1990); accord United States v. Walker, 199 Fed. Appx. 884, 886 (11th Cir. 2006) (same).  As noted, Defendant Goldstein had the burden of establishing a legitimate expectation of privacy; however, the Government has the burden of proving abandonment. Walker, 199 Fed. Appx. at 886 (citing United States v. Ramos, 12 F.3d 1019, 1023 (11th Cir. 1994)).  In arguing that it satisfied this burden, the Government relies primarily on the Eleventh Circuit Court of Appeals' decision in Sparks.  [Doc. 192 at 11-17].  As Defendant argues, that reliance is misplaced because the facts in Sparks are inapposite to those before the court - facts which objectively do not support a finding of abandonment. [Doc. 198 at 5-12].

In Sparks, as the court stated, the defendants' "day did not start well for them" when "[t]hey left their cell phone at a Walmart store" - a "phone stor[ing] hundreds of images and videos of child pornography that they had made using Spark's friend's four-

year-old child-and [defendant] Johnson was already a registered sex offender."  806

F.3d at 1329.  When Sparks returned to Walmart to try to locate the phone, she learned

that a Walmart employee, Vo, had found the phone and made arrangements to meet

with Vo to retrieve the phone.  Id. at 1329, 1343.  The court found, however, that this

initial eagerness to retrieve the phone was tempered by the defendant's instructions to

"Vo not leave the phone with customer service for Sparks to retrieve, suggesting that

she did not want the phone back at all expenses."  Id. at 1343.  Vo, after speaking with

but before meeting with Sparks, looked at the contents of the phone, which was not

password protected, and seeing the images decided to surrender the phone to law

enforcement authorities.  Id. at 1329, 1343.  Vo did not appear for the meeting with

Sparks.

The court then stated that the defendants "did a strange thing: though they knew

precisely who had the phone and where to find her, they made no attempts to locate Vo

at the Walmart where they knew she worked.  They similarly did not ask anyone at

Walmart for assistance in obtaining the phone's return from Vo.  Nor did they complain

to Walmart that a Walmart employee had found their phone at Walmart and refused to

return it.  They also chose not to file a report with the police complaining about Vo's

failure to give them back their phone, though they knew where Vo could be found."

AO 72A
(Rev.8/82)

Id.  These facts, according to the court, evidenced the defendants' "decision to stop pursuing the phone" given the reasonable alternatives available to do so, which the court found stood "in stark contrast to their urgent efforts to retrieve the phone in the period immediately after the phone was lost." This conduct, all occurring within three days, "betray[ed] the intent to abandon the phone.  In other words, [the defendants] made a conscious choice to allow a complete stranger (Vo) to keep their phone and everything on it-without so much as a password to protect the phone's contents-rather than make reasonable further efforts to obtain its return, even though they knew who had the phone and where she was." Id. at 1343-44.  The court also found, under the facts in Sparks, that the defendants engaged in affirmative acts demonstrating an intent to abandon the phone, that is, Johnson "purchased an upgraded phone for himself, filed an insurance claim for the lost phone, and obtained and provided a replacement phone to Sparks[, which] was the same model as the seized phone." Id. at 1343.

Addressing the three Blackberry cellular telephones, the facts before this court are inapposite to those before the court in Sparks and do not evidence intent by Defendant Goldstein to abandon the cellular telephones and, more specifically, the contents of those devices. Defendant Goldstein, the sole user of each of the Blackberry cellular telephones, employed Rosenberg, a personal friend for over thirty-years, as his

personal assistant in Defendant's various business operations. Unlike Vo's lack of relationship to the defendants in Sparks, Rosenberg was not a stranger but well-known to, working for and trusted by Defendant. (8/20/15 Tr. at 5, 14-18). One of Rosenberg's duties was to assist Defendant when he obtained a new Blackberry cellular telephone. Following Defendant's directions, Rosenberg would purchase the new telephone and transfer the data from the old telephone to the new telephone. (8/20/15 Tr. at 5-6). Unlike the facts in Sparks, Defendant did not lose the cellular telephones in question and forego easy steps to retrieve the telephones or, more importantly, act in a manner that evidenced an intent to jeopardize much less abandon the data contained on those cellular telephones.

The transfer of data involved, using Blackberry desktop software loaded on Rosenberg's computer, downloading the data from the old telephone and then uploading that data to the new telephone. (8/20/15 Tr. at 5-7, 9, 20-22, 24-27; 2/3/16 Tr. at 26-29, 30-31). As Rosenberg testified, in handling the cellular telephones, he followed Defendant Goldstein's instructions; he did not have any discretion concerning the telephones; he protected the data on the telephones; he did nothing to compromise the personal and business information on the telephones; and he never used or accessed data on Defendant's cellular telephones. (8/20/15 Tr. at 5-6, 17, 19, 21-22). The data

on both the old and new cellular telephones was password protected - passwords that Defendant Goldstein only gave to Rosenberg for the purpose of completing the data transfer process.  (8/20/15 Tr. at 21-22).  Transferring the data from an old cellular to the new cellular telephone "was the only permission [Rosenberg] had to access the data from Mr. Goldstein . . . ."  (2/3/16 Tr. at 33).

And simply allowing Rosenberg to retain the old cellular telephones for his infant-toddler daughter to play with or to keep in the office for Defendant's use in an emergency, under the facts of this case, does not alter the court's analysis.  Once the transfer of data was complete, Rosenberg described the old cellular telephone as, "Essentially it's a dead phone, and the new one replaces it."  (8/20/15 Tr. at 20). Rosenberg asked Defendant Goldstein if he could keep the old Blackberry cellular telephones for his infant-toddler daughter to play with, and Defendant allowed Rosenberg to keep the old cellular telephones for that purpose.  (8/20/15 Tr. at 7). Rosenberg would also keep an old Blackberry in his desk at the office in case of emergency and Defendant Goldstein needed a cellular telephone.[35]  (8/20/15 Tr. at 28).

---

[35]This data transfer to a new cellular telephone resulting in an old, unusable cellular telephone is simply not the same as in <u>Sparks</u> where the defendants lost the old cellular telephone and, instead of easily retrieving it, engaged in the affirmative acts of purchasing new cellular telephones and filing an insurance claim for the lost phone. <u>Sparks</u>, 806 F.3d at 1343-44.  The court finds that the decision finding no abandonment

Rosenberg never charged or accessed or unlocked the old cellular telephones that his daughter played with.  He also made sure that the telephones were not lost.  (8/20/15 Tr. at 7-8, 12, 28-29).  Rosenberg never accessed the cellular telephones because the data "wasn't [his] stuff so [he] never went through it" and because his "ability to access the data on those phones was limited to upgrading the phone . . . ." (2/3/16 Tr. at 33). As far as Rosenberg knew, the data on the old cellular telephones was encrypted, and he had no idea how to access that information.  (2/3/16 Tr. at 33-34).  In fact, Rosenberg stated that it was "nobody's business what was on" the old telephones and that he did not recall ever advising Defendant that, after downloading the data from the old cellular telephones, "the old phone[s] maintained all the data on them . . . ." He did not know what Defendant knew.  (2/3/16 Tr. at 35-36).  Under these circumstances,

---

by the Eighth Circuit Court of Appeals in <u>United States v. James</u>, 353 F.3d 606 (8th Cir. 2003), is based on facts more closely aligned with the facts before this court.  In <u>James</u>, the defendant sent computer discs to a third party for the purpose of storing the discs and without permission to access or examine the discs.  <u>Id.</u> at 615-16.  The court stated that "[t]wo principle factors guide[d it's] review:  first, whether [the defendant] denied ownership of the item, and second, whether he physically relinquished the item."  <u>Id.</u> at 616.  That court found that the defendant never denied ownership and that "simply [giving] the discs to [a third party] to store" does not constitute abandonment.  <u>Id.</u> Likewise in this case, Defendant Goldstein allowing Rosenberg to retain the old cellular telephones for the purpose of allowing his young daughter to play with the "essentially" dead phones or to hold the telephones for Defendant's future use does not establish abandonment.

AO 72A
(Rev.8/82)

when the individual possessing the old cellular telephones expressed an understanding that Defendant's privacy interests in whatever data contained on those telephones continued, when no affirmative actions by Defendant indicated an intent to abandon the data remaining on the telephones, and when the record is silent as to whether Defendant was even aware that the telephones retained any data, Defendant's failure to ask that the old cellular telephones be returned to him simply is not an affirmative act of abandonment.[36]   (8/20/15 Tr. at 10; 2/3/16 Tr. at 22).

And, although the circumstances under which Rosenberg possessed the back-up cellular data files differ in some respects from his possession of the old cellular telephones, the court likewise finds that the Government has not established that

---

[36]Contrary to the Government's argument [Doc. 192 at 16-17], Defendant's conduct is not similar to that of the defendant in United States v. Lehder-Rivas, 955 F.2d 1510 (11th Cir. 1992).  In that case, the defendant left a locked briefcase with a person "with whom [he] had been only briefly acquainted" and "promised to retrieve it within three months but failed to do so."  Id. at 1521.  Over a year later, after two unknown men unsuccessfully attempted to retrieve the briefcase, and, after arranging for them to collect the briefcase but they did not do so, the briefcase was released to law enforcement officials.  Id.  The court found that, because for over a year the defendant and his representatives "promised but failed to retrieve the suitcase[,]" the defendant abandoned the suitcase.  Id. at 1522.  In this case, there is no evidence of Defendant breaching a promise to retrieve the old cellular telephones or that Defendant engaged in any conduct similar to the defendant in Lehder-Rivas which would establish an intent to abandon his privacy interests in the old telephones.  The fact that Rosenberg decided unilaterally and without notice to Defendant to alter the terms under which he possessed the old cellular telephones does not establish abandonment.

Defendant abandoned his privacy interests in that information.[37]   Rosenberg's possession of those files, as true of the cellular telephones, arose out of his long-time association with and work for Defendant Goldstein.  (8/20/15 Tr. at 5-7, 9, 20-22, 24-27; 2/3/16 Tr. at 26-29, 30-31).  Rosenberg testified that the cellular telephone data on the thumb-drive was created during the transfer process of data from the old Blackberry cellular telephones to the new telephones.  (5/23/16 Tr. at 32-35).  Rosenberg stated that he did not look at or open the back-up data files and did not know how to open the files.[38]  His "only task was to transfer [the data] from one phone to the other[,]" and it "just happen[ed]" that a copy remained on his computer.  Neither he nor Defendant made the choice for a file to be created and remain on Rosenberg's computer. Furthermore, Rosenberg guarded the information and did not disseminate it to any third parties before providing the thumb-drive to the Government.  (5/23/16 Tr. at 37-38).

---

[37]Although the Government has not conducted a search of the back-up cellular telephone data on the thumb-drive, the court finds that making a determination as to whether Defendant abandoned that data will provide guidance to the Government's consideration of any future search.

[38]Again, transferring the data from an old cellular to the new cellular telephone "was the only permission [Rosenberg] had to access the data from Mr. Goldstein . . . ." (2/3/16 Tr. at 33).  And, as far as Rosenberg understood, the computer files created when the data was transferred were encrypted, and he had no idea how to access the data.  (2/3/16 Tr. at 33-34).

Rosenberg stated that he kept those files for Defendant Goldstein and not for himself and that he did not use the data or give the data to any third parties, except the Government, because the data belonged to Defendant.  (8/20/15 Tr. at 32).

With respect to what Defendant may have known about the back-up data files remaining on Rosenberg's computer, although not initially recalling the incident (2/3/16 Tr. at 36-37; 5/23/16 Tr. at 9, 39-41), Rosenberg testified that on one occasion, at Defendant's request, he used one of the cellular telephone data files he kept on his computer to transfer the most recent data available to a new Blackberry for Defendant Goldstein.  Defendant's old telephone fell into the toilet, and the data on that telephone could not be transferred to the new telephone.  (5/23/16 Tr. at 9-10, 39-40).  Otherwise, the court finds that Rosenberg's testimony about Defendant Goldstein's knowledge or lack of knowledge about the back-up cellular data files on Rosenberg's computer is conflicting and vague.

Initially Rosenberg testified that he was not sure how much knowledge Defendant Goldstein had about the cellular telephone data transfer process but thought that he should have known about the back-up cellular telephone data files on his, Rosenberg's, computer.  (8/20/15 Tr. at 32-33).  Rosenberg testified, "I know I did give him copies of the [computer] files that I created in case he ever needed them for

64

anything." (8/20/15 Tr. at 32). However, that action might very well have indicated to Defendant that Rosenberg relinquished to him, Defendant Goldstein, any back-up file. Besides the incident with the "toilet" telephone, Rosenberg also testified that he had no specific recollection of discussing the files with Defendant, and he suspected, but did not know, that Defendant was aware of the back-up files on the computer. (5/23/16 Tr. at 42-45). Based on this record, the court finds that Defendant's failure to affirmatively request that Rosenberg return all back-up files to him or request that Rosenberg delete the files does not establish intentional abandonment of the data contained in those files. Again, Rosenberg treated the data on the back-up files, which as far as he knew could not be accessed, as belonging to Defendant until he unilaterally decided to copy the files over to the thumb-drive and produce the thumb-drive to the Government.

For all of the foregoing reasons, the court finds that the Government failed to establish that Defendant Goldstein abandoned his legitimate expectation of privacy in the old cellular telephones and the data contained therein and in the back-up files created during the process of transferring data.

65

**b.**      **Warrantless Searches of Cellular Telephones**

After Rosenberg turned over the three Blackberry cellular telephones in February 2011 and August 2015 and the thumb-drive containing the back-up files for the cellular telephones in August 2015, the Government conducted searches of the Blackberry cellular telephones in February and March 2011 and in October 2015.  The Government asserts that these cellular telephones were searched based on the Government's reasonable belief that Rosenberg had the apparent authority to consent to the searches.  [Doc. 192 at 20-23].  With respect to the cellular telephone data on the thumb-drive, the Government advised the court and the parties that it has not yet accessed the computer files containing that information.  [Doc. 197 at 4].  (2/3/16 Tr. at 40).  The Government does not address any potential future search of these files.  [Doc. 197 at 20-23].   In response, Defendant Goldstein argues that based on the record before this court, agents obtaining the cellular telephones and the cellular telephone back-up data on the thumb-drive did not have a reasonable belief that Rosenberg had apparent authority to consent to the searches.  [Doc. 176 at 31-37; Doc. 198 at 18-24].  Based on the record, the court finds that Rosenberg did not have apparent authority to consent to the cellular telephone searches and that the Government's reliance on that consent was not reasonably justified.  Because the Government has not conducted a search of the back-up data files

66

on the thumb-drive [Doc. 197 at 4], issues surrounding a potential warrantless search based on Rosenberg's consent are not before the court and will not be addressed herein.[39]

As is true in any case in which there is a warrantless search and seizure, "'the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment.'" United States v. Latimore, 2014 WL 3109183, at *11 (N.D. Ga. July 7, 2014) (quoting United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983)). "The burden to establish the application of the warrant

---

[39]The court also notes that the Government has stated that it might seek to introduce materials found on the thumb-drive should it obtain a search warrant. Arguably this statement, although directed at Defendant Bercoon's computer data on the thumb-drive, includes the back-up cellular data files. [Doc. 192 at 19-20]. While this court is not pre-judging the validity of any search warrant obtained for the thumb-drive, the court notes that a search warrant obtained well-over a year after the Government came into possession of the thumb-drive in August 2015 will face scrutiny under United States v. Mitchell, 565 F.3d 1347, 1350-52 (11th Cir. 2009). And see Sparks, 806 F.3d at 1338-40 ("Law enforcement personnel must not unreasonably delay in obtaining a search warrant after seizing an item to be searched."). The court has already determined that Defendant Goldstein maintains a legitimate expectation of privacy with respect to the cellular data back-up files on the thumb-drive and, therefore, may "object to the length of the period between the seizure and [any] search" conducted pursuant to a warrant. Sparks, 806 F.3d at 1340.

exception is by a preponderance of the evidence." Id. (citing United States v. Matlock, 94 S. Ct. 988, 996 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.")).  "A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court that the existence of a fact is more probable than its non-existence." Id. (citing Metropolitan Stevedore Co. v. Rambo, 117 S. Ct. 1953, 1963 n.9 (1997)).

Initially, the court notes that the Government is not relying on the contention that the searches conducted by the FBI agents fall within the private search doctrine as an exception to the search warrant requirement of the Fourth Amendment.  A brief discussion of that doctrine and why it does not apply in this case is also pertinent to the issue of Defendant's legitimate expectation of privacy and Rosenberg's consent to search.  "The Fourth Amendment protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" United States v. Runyan, 275 F.3d 449, 456-57 (5th Cir. 2001) (quoting U.S. Const. amend. IV).  However, "[t]he Fourth Amendment proscribes only governmental action - it is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation

or knowledge of any government official." Id. at 457 (quoting United States v. Jacobsen, 104 S. Ct. 1652, 1656 (1984)) (internal quotation marks omitted); and see United States v. Meister, 596 Fed. Appx. 790, 792 (11th Cir. 2015) (same); United States v. Jarrett, 338 F.3d 339, 344 (4th Cir. 2003) (Because the Fourth Amendment "does not provide protection against searches by private individuals acting in a private capacity[,] . . . evidence secured by private searches, even if illegal, need not be excluded from a criminal trial.") (citation and internal quotation marks omitted); United States v. Bomengo, 580 F.2d 173, 175 (5th Cir. 1978) ("The Fourth Amendment proscribes only governmental action. A search by a private individual for purely private reasons does not raise Fourth Amendment implications.").

In this case, although Rosenberg's seizure of the cellular telephones and the downloading to and retention of the cellular telephone data on his computer occurred prior to his cooperation with the Government and did not involve governmental action (8/20/15 Tr. at 38-41, 50-51, 53-55; 2/3/16 Tr. at 6-7, 13-18, 30-31; 5/23/16 Tr. at 5-8), the record is abundantly clear that Rosenberg did not conduct any search of these materials which would impact Defendant's Fourth Amendment rights to challenge the Government's subsequent searches. See United States v. Grimes, 244 F.3d 375, 383 (5th Cir. 2001) (after a private search, a person no longer possesses a reasonable

expectation of privacy within the scope of the private search); United States v. Kinney, 953 F.2d 863, 866 (4th Cir. 1992); Bomengo, 580 F.2d at 176 (to the extent of a private invasion of a defendant's expectation of privacy, that expectation of privacy is lost).

As part of the process of transferring data from one of Defendant Goldstein's old Blackberry cellular telephones to a new Blackberry, Rosenberg never accessed or modified the data remaining on the old Blackberry, remaining on his computer as part of the transfer process, or now on the new Blackberry. (8/20/15 Tr. at 7, 9). Rosenberg never used Defendant's cellular telephones or searched the data on the telephones. (8/20/15 Tr. at 17). With respect to the old cellular telephones that his daughter played with or that he kept for Defendant's future use, Rosenberg never charged or accessed or unlocked the old cellular telephones. He made sure that the telephones were not lost. (8/20/15 Tr. at 7-8, 12, 28-29). Rosenberg also stated that the data on the cellular telephones "wasn't [his] stuff so [he] never went through it" and that his "ability to access the data on those phones was limited to upgrading the phone . . . ." (2/3/16 Tr. at 33). Transferring the data from an old cellular to the new cellular telephone "was the only permission [he] had to access the data from Mr. Goldstein . . . ." (2/3/16 Tr. at 33). In fact, the data files, as Rosenberg understood, on the cellular telephones and on

the computer files created when the data was transferred were encrypted, and he had

no idea how the access the data.  (2/3/16 Tr. at 33-34).

In <u>Bomengo</u>, the former Fifth Circuit Court of Appeals stated:

> We have long recognized that a police view subsequent to a search
> conducted by private citizens does not constitute a "search" within the
> meaning of the Fourth Amendment so long as the view is confined to the
> scope and product of the initial search.

580 F.2d at 175.  In <u>Jacobsen</u>, the Supreme Court stated the test as follows:  "The

additional invasions of [a defendant's] privacy by the government agent must be tested

by the degree to which they exceeded the scope of the private search."  104 S. Ct. at

1657, 1658-59 ("Once frustration of the original expectation of privacy occurs, the

Fourth Amendment does not prohibit governmental use of the now-nonprivate

information . . . .  The Fourth Amendment is implicated only if the authorities use

information with respect to which the expectation of privacy has not already been

frustrated.").  Clearly in this case, because Rosenberg did not search the cellular

telephones or the files on his computer, the private search doctrine does not apply to

provide an exception to the warrant requirement nor to frustrate Defendant's

expectation of privacy in the data on the old cellular telephones or in the back-up files

for that data on the thumb-drive.  <u>See also</u> <u>Sparks</u>, 806 F.3d at 1334-1336 (applying the

71

Supreme Court's reasoning in <u>Riley</u>, regarding the wealth of information contained in cellular telephones and the privacy interests associated with that information, to find that the law enforcement officer's viewing of child pornography videos in the defendants' cellular telephone not previously viewed by the Walmart employee exceeded the scope of the private search and holding that while the "private search of the cell phone might have removed certain information from the Fourth Amendment's protections, it did not expose every part of the information contained in the cell phone").

Because the private search doctrine does not justify the warrantless searches, the Government asserts that Rosenberg consented to the searches and that the agents reasonably relied on his apparent authority to consent. [Doc. 192 at 20-23]. "It has been long recognized that police officers, possessing neither reasonable suspicion nor probable cause, may nonetheless search [property] without a warrant so long as they first obtain the voluntary consent [for the search]." <u>United States v. Blake</u>, 888 F.2d 795, 798 (11th Cir. 1989) (citing <u>Schneckloth v. Bustamonte</u>, 93 S. Ct. 2041 (1973)). "Whether a suspect voluntarily gave consent to a search is a question of fact to be determined by the totality of the circumstances." <u>Blake</u>, 888 F.2d at 798 (citing <u>Schneckloth</u>, 93 S. Ct. at 2059); <u>see also</u> <u>United States v. Nuyens</u>, 17 F. Supp. 2d 1303,

1306 (M.D. Fla. 1998) ("Voluntariness of consent is a question of fact, and the Court must look to the totality of the circumstances."). "The government bears the burden of proving both the existence of consent and that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily." Blake, 888 F.2d at 798 (citing United States v. Massell, 823 F.2d 1503, 1507 (11th Cir. 1987)); see also United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) ("A consensual search is constitutional if it is voluntary; if it is the product of an 'essentially free and unconstrained choice.'") (citation omitted).

In this case, the consent relied on is not that of Defendant Goldstein but of Rosenberg, a third party. Defendant does not focus his objection to Rosenberg's consent on voluntariness[40] but on whether Rosenberg had actual or apparent authority to consent. [Doc. 176 at 31-37; Doc. 198 at 18-24]. As the Seventh Circuit Court of

---

[40]The facts support a finding that Rosenberg's consent was voluntary. He entered a cooperation agreement with the Government, and, as a part of his cooperation, he agreed to produce to the Government any files or documents that he had in his possession acquired during his previous employment with Defendants Bercoon and Goldstein. (8/20/15 Tr. at 4-5, 38-41; 2/3/16 Tr. at 30-32; Gov't Exh. 1). Thereafter, Rosenberg produced the three Blackberry cellular telephones and the thumb-drive. (8/20/15 Tr. at 38-41). Rosenberg intended for the Government to access the data, if any, remaining on the cellular telephones. (8/20/15 Tr. at 13). He turned over the cellular telephones because there "maybe data on there that [the Government] can use . . . ." (8/20/15 Tr. at 8-9, 13). There is no indication in the record that Rosenberg did not have the same intent when turning over the thumb-drive.

AO 72A
(Rev.8/82)

Appeals stated, "A third party with common authority over the premises [or effects] sought to be searched may provide such consent. . . .  Common authority is based upon mutual use of property by persons generally having joint access or control."  United States v. Aghedo, 159 F.3d 308, 310 (7th Cir. 1998) (citations omitted); accord United States v. Thomas, 818 F.3d 1230, 1240 (11th Cir. 2016) ("When two people share common authority over 'premises or effects,' the consent of one person 'is valid as against the absent nonconsenting person with whom the authority is shared.'") (citation omitted).  As noted by the Supreme Court, "[c]ommon authority is, of course, not to be implied from the mere property interest a third party has in the property . . . but rests rather on the mutual use of the property by persons generally having joint access or control for most purposes . . . ."  Matlock, 94 S. Ct. at 993 n.7; see also United States v. Backus, 349 F.3d 1298, 1299 (11th Cir. 2003) (same).  Furthermore, as recently affirmed by the Eleventh Circuit Court of Appeals in United States v. Garcia-Jaimes, 484 F.3d 1311 (11th Cir. 2007), vacated and remanded on other grounds, Nunez-Virraizabal v. United States, 128 S. Ct. 2901 (2008), "even if the consenting party does not in fact have the requisite relationship to the [item to be searched], if the officer has an objectively reasonable, though mistaken, good-faith belief that the consent was a valid consent, there is no Fourth Amendment violation."  Id. at 1323.  "As with other

74

factual determinations bearing upon search and seizure, determination of consent . . .

must be judged against an objective standard: would the facts available to the officer

at the moment . . . warrant a man of reasonable caution in the belief that the consenting

party had authority over the [item to be searched]?" Illinois v. Rodriguez, 110 S. Ct.

2793, 2801 (1990) (quoting Terry v. Ohio, 88 S. Ct. 1868, 1880 (1968)) (internal

quotation marks omitted); see also United States v. Mercer, 541 F.3d 1070, 1074 (11th

Cir. 2008) (same). It is the Government's burden to establish that Rosenberg had actual

authority or apparent authority to consent to the searches. See Rodriguez, 110 S. Ct.

at 2797.

The Government does not contend that Rosenberg had actual authority to consent

to the searches in question. And the record supports a finding that he did not. The

government, in fact, presented no evidence of common authority over the old cellular

telephones much less the data contained in the old cellular telephones at the suppression

hearing. See United States v. Jaras, 86 F.3d 383, 389 (5th Cir. 1996) (the court stated

that a "finding of actual authority requires proof that the consenting party and the party

challenging the search 'mutually used the property [or space within the property]

searched and had joint access to and control of it for most purposes, so that it is

reasonable to recognize that either user had the right to permit inspection of the

property and that the complaining co-user had assumed the risk that the consenting co-user might permit the search'") (citation omitted).

Rosenberg's initial possession of the old cellular telephones was for the limited purpose of transferring data; he did not access the data on the cellular telephones and did nothing to compromise Defendant's personal and business information on the telephones. (8/20/15 Tr. at 5-6, 19, 21-22). Rosenberg never accessed or modified the data remaining on old Blackberry cellular telephones, remaining on his computer as part of the transfer process, or now on new Blackberry cellular telephones. (8/20/15 Tr. at 7, 9). Rosenberg never used Defendant's cellular telephones or searched the data on the telephones. (8/20/15 Tr. at 17). And he only possessed the old cellular telephones, items he described as, "[e]ssentially it's a dead phone, and the new one replaces it[,]" with Defendant's permission for his infant-toddler daughter to play with or for Defendant's future use. (8/20/15 Tr. at 7, 20, 28). The telephones were never charged or accessed or unlocked. (8/20/15 Tr. at 7-8, 12, 28-29). And Rosenberg was very clear about his understanding that Defendant's right to privacy in the data remained on the old telephones. He testified that the data on the cellular telephones "wasn't [his] stuff so [he] never went through it" and that his "ability to access the data on those phones was limited to upgrading the phone . . . ." (2/3/16 Tr. at 33).

76

Transferring the data from an old cellular to the new cellular telephone "was the only permission [he] had to access the data from Mr. Goldstein . . . ." (2/3/16 Tr. at 33). In fact, the data files, as Rosenberg understood, on the cellular telephones and on the computer files created when the data was transferred was encrypted, and he had no idea how to the access the data. (2/3/16 Tr. at 33-34). The data on the old cellular telephones, additionally, was password protected, and Rosenberg only had the password(s) - which he no longer specifically recalled for the telephones turned over to the Government - for the purpose of transferring the data pursuant to Defendant's directions. (8/20/15 Tr. at 7, 9-11, 21-22, 35-36, 38).

Although not involving the same type of closed containers as in this case, the decision in United States v. Waller, 426 F.3d 838 (6th Cir. 2005), is persuasive.[41] In Waller, the court found that the lessee did not have actual authority to consent to the search of luggage belonging to the defendant who had left the luggage, along with other

---

[41]Other courts have analogized computers to other types of closed containers in deciding the validity of third party consent. See United States v. Wright, - - - F.3d - - -, - - -, 2016 WL 5338528, at *3 (7th Cir. September 23, 2016) (discussing the exercise of common authority over a computer, the court stated that "in this context computers are akin to closed containers" in that "[t]he information they 'contain' is usually not readily observable without some further investigation") (citing, inter alia, United States v. Buckner, 473 F.3d 551, 554 (4th Cir. 2007); United States v. Andrus, 483 F.3d 711, 718 (10th Cir. 2007)).

AO 72A
(Rev.8/82)

personal items, in the apartment with the consent of the lessee.  The evidence established that the lessee and the defendant "held a mutual understanding that the luggage contained Waller's private personal effects" and that "Waller never gave [the lessee] permission to open the luggage bag and [the lessee] never did so."  Id. at 845. Noting that "[a] valid consent to search the closed container must come from one who has common authority over the effects sought to be inspected, one who has mutual use of the property, and one who generally has joint access or control for most purposes[,]" the court held that the lessee "did not have *mutual use* of the luggage, nor did he have joint access and control *for most purposes*.  Thus, he did not have common authority to grant permission to search Waller's luggage."  Id. at 845-46 (emphasis in original). And see James, 353 F.3d at 614 (finding that a third party storing discs for the defendant, who did not grant permission to access the discs, who marked the discs as confidential (as compared to protecting a computer with a password) and who only granted the third party limited authority to open his mail - not the discs, did not have actual authority to consent to a search of the discs).[42]

---

[42]The cases found by the court finding actual authority by a third party to consent to a search of electronic devices involved computers or devices found in the common areas of a residence co-occupied by others, usually family members, who have use of the computer and access to the contents of the computer or over computers - or files within the computer - that are not password protected or encrypted.  See, e.g., Wright, -

And the court finds, contrary to the Government's arguments, that Rosenberg did not have apparent authority to consent to the searches.  As noted, the Government must establish, "even if [Rosenberg did] not in fact have the requisite relationship to the" cellular telephones, that the FBI agents had "an objectively reasonable, though mistaken, good-faith belief that the consent was a valid consent, [and, therefore,] there is no Fourth Amendment violation."  Garcia-Jaimes, 484 F.3d at 1323. "Apparent authority to consent depends on a reasonable mistake of fact, as distinguished from a mistake of law."  United States v. Acosta, 807 F. Supp. 2d 1154, 1209 (N.D. Ga. 2011) (citations and internal quotation marks omitted).  "In other words, Rodriguez . . . applies to situations in which an officer would have had valid consent to search *if the facts were as he reasonably believed them to be . . . .*"  United States v. Salinas-Cano, 959 F.2d 861, 865 (10th Cir. 1992) (citations and internal quotation marks omitted). "For purposes of searches of closed containers, mere possession of the container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents. . . .  Rather, apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched, because these characteristics are particularly probative of

- - F.3d at - - -, 2016 WL 5338528, at **3-4; Thomas, 818 F.3d at 1241-42.

79

whether the individual has authority over the property." <u>United States v. Basinski</u>, 226 F.3d 829, 834 (7th Cir. 2000); <u>see also</u> <u>Wright</u>, - - - F.3d at - - -, 2016 WL 5338528, at *5 (to determine whether a third party possesses the apparent authority to consent to search of a container, "''one must look for indicia of actual authority' over the container known to the officer at the time of the search") (citation omitted); <u>United States v. Rodriguez</u>, 2011 WL 3495398, at **6-7 (S.D. Ala. August 10, 2011) (applying same considerations to closed container and third party consent to search).

The court will begin by reviewing what information the FBI agents had at the time of the searches of the cellular telephones.  Agent Taylor, who received the Blackberry Bold and Blackberry 8310, testified that he first met with Rosenberg in August 2010 and that he did not recall any specific discussion about the cellular telephones.  (8/20/15 Tr. at 45-46).  When he received the first telephone in February 2011, Rosenberg advised "[t]hat he had the responsibility as an employee to occasionally exchange phones, upgrade phones for Mr. Goldstein and Mr. Bercoon and several other employees."  (8/20/15 Tr. at 46-47).  Rosenberg testified that he advised federal agents that one of his tasks was to transfer cellular telephone data when Defendant Goldstein either wanted to upgrade his Blackberry or had to obtain a new Blackberry due to damage to his existing telephone.  (8/20/15 Tr. at 5-6).  The record

80

before the court is not clear how much detail Rosenberg provided to Agent Taylor about the data transfer process or what the agent asked Rosenberg about the process. And the record is not clear concerning what Rosenberg said to the agent or what, if anything, the agent asked Rosenberg about his possession of the telephones. However, Rosenberg did advise the agent that he did not have any idea whose telephones he was turning over. (8/20/15 Tr. at 5-6, 12-13, 38).

The third Blackberry cellular telephone and the thumb-drive were turned over to Agent Cromer on August 20, 2015, at the first evidentiary hearing. Agent Cromer was present at the hearing and, therefore, heard Rosenberg testify about the details of his possession of the cellular telephones. (8/20/15 Tr. at 2). Accordingly, Agent Cromer knew, before he conducted the October 2015 search of the cellular telephone, that Rosenberg followed Defendant Goldstein's instructions when handling the telephones; that he did not have any discretion concerning the telephones; that he protected the data on the telephones; and that he did nothing to compromise the personal and business information on the telephones. (8/20/15 Tr. at 5-6, 19, 21-22). The agent was aware that Defendant Goldstein provided his password for the cellular telephones *only* to allow Rosenberg access for the data transfer process and that Rosenberg, who was not even sure whose telephones he had surrendered, did not recall

81

the passwords used on a specific telephone.[43]  (8/20/15 Tr. at 9-11, 21, 35-36, 38).  The

agent was aware that Rosenberg stated that he never accessed or modified the data

remaining on the old telephones, remaining on his computer as part of the transfer

process, or now on the new telephones and that he never used Defendant's cellular

telephones or searched the data on the telephones.  (8/20/15 Tr. at 7, 9, 17).  And the

agent knew from the testimony that Rosenberg considered the old telephones "dead"

and that Defendant Goldstein allowed Rosenberg to keep the old telephones for his

infant-toddler daughter to play with but that the telephones were never charged,

accessed or unlocked.  Also, Rosenberg kept an old cellular telephone at the office for

Defendant's use in an emergency.  (8/20/15 Tr. at 7-8, 12, 20, 28-29).

Agent Cromer also testified that he talked with Rosenberg in October 2015

before accessing the data on the Blackberry 8700C and that Rosenberg said that he

found additional cellular telephones when moving stuff and that he was not sure to

---

[43]All of the old cellular telephones were password protected.  (8/20/15 Tr. at 21).
Although there must have been some discussion, the record is silent as to what Agent
Taylor or Agent Cromer asked Rosenberg about the passwords required to access the
cellular telephones.  By August 2015, Rosenberg did not have any independent
recollection of the passwords used by Defendant Goldstein nor recall advising federal
agents of any passwords that would unlock the Blackberry telephones, but, if he had
recalled the passwords at the time he produced the cellular telephones, he would have
told the agents but no one else.  (8/20/15 Tr. at 9-11).

whom the three additional Blackberry cellular telephones belonged but stated the old Skytell turned over was received from Defendant Goldstein to discard. (2/3/16 Tr. at 11-12). Rosenberg also advised that he had obtained the Blackberry cellular telephones in order to upgrade to new telephones during his work with Defendant's business just like the Blackberry Bold and Blackberry 8310 and that he possessed the telephones for that purpose. (2/3/16 Tr. at 12-13, 16, 18). The agent did not ask Rosenberg any details about Defendant Goldstein's instructions regarding the Blackberry telephones except that Defendant Goldstein told Rosenberg to download information and transfer that information to the new telephone. (2/3/16 Tr. at 19). Rosenberg also advised that his child played with the old cellular telephones and that the telephones were never turned on, were dead and were not charged.[44] Rosenberg advised the agent that he "would protect the data on the phones." (2/3/16 Tr. at 20).

The information Agent Taylor and, especially, Agent Cromer knew at the time of the searches in question does not support a finding that the FBI agents had "an objectively reasonable, though mistaken, good-faith belief that [Rosenberg's] consent was a valid consent[,]" Garcia-Jaimes, 484 F.3d at 1323, because Rosenberg did not

---

[44]The agent had to charge the telephone before extracting the data. (2/3/16 Tr. at 20).

exercise "mutual use of the [devices]" and did not have "joint access or control [over the devices] for most purposes[,]" Matlock, 94 S. Ct. at 993 n.7. The information relied on by the agents to assert their belief that Rosenberg had apparent authority to consent to the searches of the cellular telephones leaves too many questions unasked and unanswered in the light of the circumstances presented.

The following facts are material to Rosenberg's consent to search the Blackberry 8700C received by Agent Cromer on August 20, 2015, and searched in October 2015. That cellular telephone was password protected - a password that Rosenberg could not have provided to the agent specifically for that cellular telephone because Rosenberg did not know to whom the cellular telephone belonged and because, by August 2015, as he testified, he did not recall specific passwords. (8/20/15 Tr. at 9-11, 21; 2/3/16 Tr. at 5-6, 10-12). And, even if Rosenberg did specifically recall the password, as Agent Cromer was aware, Rosenberg only had Defendant's passwords for the purpose of transferring the data, and the agent knew that Rosenberg never used, or even believed he had the right to use, the passwords to access the data on the cellular telephone. (8/20/15 Tr. at 5-7, 9). The existence of password protection has been held to "eliminate[ ] apparent authority to consent to computer searches[,]" and the court sees no practical difference in password protected cellular devices. United States v. Trejo,

84

471 Fed. Appx. 442, 448 (6th Cir. 2012); and see Wright, - - - F.3d at - - -, 2016 WL 5338528, at *5 ("When the container at issue is a computer, a key consideration is 'whether law enforcement knows or should reasonably suspect because of surrounding circumstances that the computer is password protected.'") (quoting Andrus, 483 F.3d at 719); Buckner, 473 F.3d at 555 (in finding that the third party had actual authority to consent to a search of the computer, the court found that "the officers did not have any indication from [the third party], or any of the attendant circumstances, that any files were password-protected"). The fact that Defendant provided the passwords to Rosenberg for the limited purpose of transferring data does support a reasonable belief by the agent that Rosenberg had authority to allow unlimited access - using the passwords - for other purposes.

Furthermore, Agent Cromer knew that Rosenberg did not believe that he had the right to access the data remaining on the old cellular telephones but that the data belonged to Defendant. (8/20/15 Tr. at 5-7, 17, 19, 21-22). Rosenberg only had possession of the old cellular telephones, with Defendant's permission, for his young child to play with or for Defendant's future use. (8/20/15 Tr. at 7, 20). Nothing contained in Defendant's permission to Rosenberg to possess the old cellular telephones included the right to access the data, and Rosenberg did not access the data.

85

Rosenberg, in fact, advised the agent that he "protect[ed] the data on the phones." (8/20/15 Tr. at 7-8, 12, 28-29; 2/3/16 Tr. at 20).  As to this closed and locked container, the Government simply has not met its burden of establishing that Agent Cromer had a reasonable, good faith belief, based on the facts of which he was aware at the time of the search, that Rosenberg had "mutual use of the property" and had "joint access or control [over the property] for most purposes . . . ." Matlock, 94 S. Ct. at 993 n.7; and see Basinski, 226 F.3d at 834 ("apparent authority turns on the government's knowledge of the third party's use of, control over, and access to the container to be searched . . .").

Likewise, Agent Taylor did not have a good faith, reasonable basis to believe, when the searches of the telephones occurred in February and March 2011, that Rosenberg had authority to consent to a search of the data on the Blackberry Bold and Blackberry 8310.  Too many red flags were raised by the limited information obtained by the agent before conducting the search of the closed containers.  See Basinski, 226 F.3d at 834 ("mere possession of the [closed] container by a third party does not necessarily give rise to a reasonable belief that the third party has authority to consent to a search of its contents"); and see James 353 F.3d at 614 ("one does not cede dominion over an item to another just by putting him in possession").  In Waller, the

86

Sixth Circuit Court of Appeals summarized the law this court finds applicable to

analysis of the issue of Rosenberg's apparent authority to consent in this case:

> Whether the facts presented at the time of the search would "warrant a
> man of reasonable caution" to believe the third party has common
> authority over the property depends upon all of the circumstances. . . .
> The government cannot establish that its agents reasonably relied upon a
> third party's apparent authority "if agents, faced with an ambiguous
> situation, nevertheless proceed without making further inquiry.  If the
> agents do not learn enough, if the circumstances make it unclear whether
> the property about to be searched is subject to 'mutual use' by the person
> giving consent, 'then warrantless entry is unlawful without further
> inquiry.'" . . .  Where the circumstances presented would cause a person
> of reasonable caution to question whether the third party has mutual use
> of the property, "warrantless entry without further inquiry is unlawful[.]"
> Rodriguez, [110 S. Ct. at 2801] (noting that "the surrounding
> circumstances could conceivably be such that a reasonable person would
> doubt [the apparent consent] and not act upon it without further inquiry").

426 F.3d at 846 (remaining citations omitted); accord United States v. Purcell, 526 F.3d

953, 963-64 (6th Cir. 2008).[45]

---

[45]The court in Waller cited a number of cases from other circuits recognizing "an
officer's duty to inquire in ambiguous situations."  426 F.3d at 847 (citing, e.g., United
States v. Kimoana, 383 F.3d 1215, 1222 (10th Cir. 2004); United States v. Rosario, 962
F.2d 733, 738 (7th Cir. 1992); United States v. Whitfield, 939 F.2d 1071, 1075 (D.C.
Cir. 1991)).  Additionally, the same "ambiguity" test is applied in the Eighth Circuit.
See United States v. Almeida-Perez, 549 F.3d 1162, 1172 (8th Cir. 2008).  The court did
not find a decision of the Eleventh Circuit Court of Appeals applying - or rejecting -
this test.  However, this court has applied the same reasoning in Acosta, 807 F. Supp.
2d at 1209-10, to explain why the agents did not reasonably and in good faith rely upon
a third party's apparent authority to consent.

Agent Taylor obtained very little information before conducting the searches of the closed containers in this case.  Rosenberg advised the agent "[t]hat he had the responsibility as an employee to occasionally exchange phones, upgrade phones for Mr. Goldstein and Mr. Bercoon and several other employees" (8/20/15 Tr. at 46-47) but that he had no idea whose telephones, which were password protected, he was turning over (8/20/15 Tr. at 21, 46-47).  This brief explanation should have caused the agent to question whether  Rosenberg had only a limited right to or ability to access the data because, if he had accessed the data on the telephones, Rosenberg should have been able to determine (and advise the agent of) ownership of each telephone.  And the statement about Rosenberg's duties should have triggered further inquiry about the circumstances of his continued possession of the telephones well-after his duty of transferring data ended.  Further any general information provided by Rosenberg about the passwords used by Defendant (8/20/15 Tr. at 21, 91-11, 35-36, 38) also should have led the agent to inquire about the circumstances surrounding Rosenberg's knowledge of the passwords.  Password protection on electronic devices is essentially the same as the agent being confronted with a locked door or container and should trigger the same type of inquiries to determine the extent of the third party's right to consent.  See Wright, - - - F.3d at - - -, 2016 WL 5338528, at *5; Thomas, 818 F.3d at 1241-42.

88

However, based on the testimony of both Rosenberg and Agent Taylor, the agent asked very few questions about Rosenberg's access to the data on the cellular telephones and appears to have asked no questions concerning the passwords or the circumstances of Rosenberg's current possession of the telephones.  (8/20/15 Tr. at 5-6, 12-13, 35, 38, 45-47).   Agent Taylor did not learn enough, under circumstances making it unclear whether the cellular telephones about to be searched were subject to mutual use and joint control and access by Rosenberg; therefore, the warrantless data searches are unlawful due to the agent's failure to conduct further inquiry.  See Waller, 426 F.3d at 846.

The significance of the agent's failure to conduct even a basic inquiry, in light of the questions raised by the minimal information provided by Rosenberg and although knowing that the telephones were password protected, is evidenced by what the agent would have learned from asking Rosenberg a few simple questions, such as, why do you not know to whom the telephones belong; what was and is your level of access to the data on the telephones; how did you acquire the passwords; and describe your use of the telephones and the circumstances of your possession of the telephones at this time.  The agent would have learned that Rosenberg followed Defendant Goldstein's instructions when handling the telephones; that he did not have any

89

discretion concerning the telephones; that he protected the data on the telephones; and that he did nothing to compromise the personal and business information on the telephones.  (8/20/15 Tr. at 5-6, 19, 21-22).

When explaining the process for transferring the data from an old cellular telephone to a new cellular telephone, Rosenberg would have advised that Defendant only provided his password because it was necessary for the transfer process and that he, Rosenberg, never accessed or modified the data remaining on the old Blackberry, remaining on his computer as part of the transfer process, or now on the new Blackberry because the data "wasn't [his] stuff so [he] never went through it" and because his "ability to access the data on those phones was limited to upgrading the phone . . . ." (8/20/15 Tr. at 5-7, 9, 21-22; 2/3/16 Tr. at 33).  The agent could have learned that transferring the data from an old cellular to the new cellular telephone "was the only permission [Rosenberg] had to access the data from Mr. Goldstein . . . ." (2/3/16 Tr. at 33).  Rosenberg never used Defendant's cellular telephones or searched the data on the telephones.  (8/20/15 Tr. at 17).  Rosenberg would have also explained that the old cellular telephones were "dead" and that Defendant allowed him to keep the telephones for his daughter to play with or that he kept a telephone for Defendant's use in emergencies but that the data on the telephones was never accessed and the

telephones were not charged or unlocked.   (8/20/15 Tr. at 7-8, 12, 20, 28-29).

Rosenberg did not have authority to consent to a search of the telephones that he turned

over to Agent Taylor.  He did not have mutual use of and control over and access to the

contents of the telephones.  And Agent Taylor, although faced with circumstances that

should have caused him to inquire further regarding Rosenberg's authority to consent,

failed to do so.[46]  As was true of Agent Cromer's warrantless search of the Blackberry

8700C in October 2015, Agent Taylor's warrantless searches of the Blackberry Bold

_____

[46]The circumstances facing Agent Taylor can be contrasted to those facing the
officers in Andrus, which the court did not find ambiguous and requiring further
inquiry in order for the officers to rely on the third party's apparent authority to consent
to a search of a computer.  At the time the search of the computer commenced, the
officers knew (1) that the defendant's father, Dr. Andrus, owned and lived in the
residence where the computer was located and paid for the internet service and cable
for the residence, (2) that the email address receiving child pornography was active, (3)
that, although the defendant lived in the bedroom where the computer was located, Dr.
Andrus had access to the room and that the computer was in plain view and appeared
available for use by family members and (4) that Dr. Andrus observed the search
beginning and did not object.  Importantly, the officers did not have any indication that
the computer was password protected.  483 F.3d at 720-21.  Based on these facts, the
court found that the officers had "an objectively reasonable perception that Dr. Andrus
was, at least, *one* user of the computer" giving him "apparent authority to consent to a
search."  Id. at 721 (emphasis added).

and Blackberry 8210 in early 2011 violated Defendant Goldstein's Fourth Amendment rights.[47]

## III.   Conclusion

For the foregoing reasons, the court **RECOMMENDS** that Defendant Goldberg's motion [Doc. 47] to suppress the results of the warrantless searches of the three cellular telephones be **GRANTED** and that Defendant's motion [Doc. 47] to suppress the fruits of the search of the thumb-drive be **DENIED** as **MOOT** because, as to the computer files containing the back-up cellular telephone data files, the Government has not yet conducted any search [Doc. 197 at 4] and, as to the other files contained on the thumb-drive originating from Defendant Goldstein's computer, the Government does not intend to introduce at trial or in the cross-examination of any witness (excepting if Defendant Goldstein testifies, under the impeachment exception to the exclusionary rule, if applicable, or if the Government obtains a search warrant for the materials) any materials contained on the thumb-drive that originated from the

---

[47]Although, as noted, the court is not addressing Rosenberg's authority, either actual or apparent, to consent to a search of the back-up data files on the thumb-drive, the record currently before the court includes testimony about Rosenberg's limited use and access to the back-up files. (8/20/15 Tr. at 7, 9, 32; 2/3/16 Tr. at 26-29, 30-31, 33-34; 5/23/16 Tr. at 5-8, 32-38). This information appears to undermine the reasonableness of governmental reliance on Rosenberg's consent to conduct a warrantless search of the back-up data files at this time.

AO 72A
(Rev.8/82)

computer of Defendant Goldstein; and the court **RECOMMENDS** that Defendant Bercoon's motion [Doc. 147] to suppress the search of the thumb-drive be **DENIED** as **MOOT** because the Government does not intend to introduce at trial or in the cross-examination of any witness (excepting if the Defendant Bercoon testifies, under the impeachment exception to the exclusionary rule, if applicable, or if the Government obtains a search warrant for the materials) any materials contained on the thumb-drive that originated from the computer of Defendant Bercoon.

## Conclusion

For the foregoing reasons and based on the cited authority:

(1)     the court **DENIES** Defendants Bercoon's and Goldstein's motion [Doc. 55] for disclosure of communications between the SEC and DOJ; and

(2)     the court **RECOMMENDS** that Defendant Goldstein's motion [Doc. 55] to suppress his statement based on voluntariness be **DENIED**;

(3)     the court **RECOMMENDS** that Defendant Goldberg's motion [Doc. 47] to suppress the results of the warrantless searches of the three cellular telephones be **GRANTED** and that Defendant's motion [Doc. 47] to suppress the fruits of the search of the thumb-drive be **DENIED** as **MOOT** as stated *supra*; and

93

(4)     the court **RECOMMENDS** that Defendant Bercoon's motion [Doc. 147] to suppress the fruits of the search of the thumb-drive be **DENIED** as **MOOT** as stated *supra*.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial.

**IT IS SO ORDERED** and **RECOMMENDED**, this 1st day of November, 2016.


JANET F. KING
UNITED STATES MAGISTRATE JUDGE

94